UNITED STATES, Appellee

v.

THORWALD G. CHRISTENSEN, Private First Class, U. S. Army, Appellant

4 USCMA 22, 15 CMR 22

No. 2394

Decided March 19, 1954

 

LT COL Herman P. Goebel, Jr., U. S. Army, MAJ Edwin Doran, U. S. Army, and 1ST LT Jack J. Albert, U. S. Army, for Appellant.

LT COL Thayer Chapman, U. S. Army, LT COL William R. Ward, U. S. Army, and 1ST LT Donald M. Sukloff, U. S. Army, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

The accused was convicted by an Army general court-martial in Korea of assault with intent to murder, and of offering violence to a superior officer while in the execution of his office—violations of the Uniform Code of Military Justice, Articles 134 and 90, 50 USC §§ 728 and 684, respectively. He was sentenced to receive a dishonorable discharge, to forfeit all pay and allowances, and to be confined at hard labor for twenty years. Following approval by intermediate authorities, we granted the accused's petition for review to determine three issues:

1. Whether the instructions upon the elements of assault with intent to commit murder were prejudicially erroneous.

2. Whether the accused was prejudiced by the failure of the law officer's instructions to embrace assault with a dangerous weapon as a lesser included offense.

3. Whether the findings and sentence involved multiplicity.

II

A brief resume of the evidence will serve to put these issues in perspective. After drinking a considerable quantity of alcoholic liquor, some of it a Korean beverage referred to colloquially as "yak juice," the accused entered his company's mess hall. Finding a seat, he began "blowing a horn and making a disturbance" which led the mess sergeant to direct him to maintain silence. The accused then left the structure, but returned shortly thereafter with a carbine. Sergeant Coleman, the accused's first sergeant, approached for the purpose of ordering him from the mess hall. The accused took up the weapon and thrust a round into the chamber—but a nearby soldier succeeded in disarming him. Once more the accused departed, only to return shortly thereafter with another carbine and a gallon jug, which appears to have contained an appreciable quantity of "yak juice." Sergeant Coleman again approached the accused, who threatened to fire if the latter drew nearer. Sergeant Coleman testified that the accused remarked at the time that he really did not wish to harm him—but instead desired to shoot "a second john." A further witness testified that the accused had remarked to Coleman at the time that "if Lt.

24

Maguire comes down here, he is the man I want." Following the conversation with Sergeant Coleman, the accused resumed his meal—still in possession of the second carbine and the jug. At this point, Second Lieutenant Arthur T. Maguire, the mess officer, made his appearance, having been informed of the preceding disturbances. Upon glimpsing the accused, the officer approached him, whereupon the accused threatened, "Come any closer and I'll shoot you." Maguire continued his advance, although at a slow pace. One Burke, a soldier standing nearby, attempted to grasp the accused's carbine, but the latter was able to raise his weapon and fire twice. Only the first round struck Maguire and penetrated the left side of his chest. Before further rounds could be fired, Burke succeeded in disarming the accused. This soldier testified that during the interval between the two shots, the accused had commented, "I am going to give him two," and that after the second report, the accused added "I shot him, I am glad I did." According to Burke, the accused made a similar statement thereafter in the orderly room.

A defense witness testified that the accused was staggering to some extent and in the former's opinion was drunk. The accused took the stand and testified to the consumption of a substantial quantity of whiskey and "yak juice." Unfortunately the defense was unable to produce expert testimony concerning the intoxicative effect of the latter concoction because, as defense counsel put it, "the experts are either dead or in the stockade." The accused remembered blowing "a tin whistle made out of a beer can," talking with the mess sergeant, securing a carbine, conversing with Sergeant Coleman, being disarmed, going to the guard house, acquiring another carbine, reentering the mess hall, and glancing up and seeing "Lt. Maguire coming at me." The accused then continued his narrative: "I told him not to . . . with me, and I think I was backing away from him, and I thought I had my weapon pointed at the floor and there was a blur and the two shots, and I remember being up in the orderly room and they was asking me why I did it. The only reason I can give you is that I was drunk."

The accused did not remember the action of Burke in grasping him, but he did recall that, when struck, Lieutenant Maguire "reeled like in a western movie." The accused denied any sort of animosity toward his victim. There seems to be no doubt that the accused had been drinking heavily immediately before the incident in question, and that his actions on the present occasion were altogether unlike his conduct when sober.

## III

During the course of instructions upon the offense of assault with intent to murder, the law officer defined the elements of murder, and included therein the following: "That, at the time of the killing, the accused intended to kill or inflict great bodily harm." In United States v. Floyd, 2 USCMA 183, 7 CMR 59, we held that, as to the offense of assault with intent to murder, the term "murder" must be limited to that variety of the crime characterized by an intent to kill. Since no such limitation was placed upon the term in these instructions, error resulted. United States v. Woodson, 3 USCMA 372, 12 CMR 128. The mere showing of error, however, does not establish prejudice, and it has been suggested that a "mountain-molehill" approach can properly be applied in the case at bar. See United States v. Jenkins, 1 USCMA 329, 3 CMR 63; United States v. Moynihan, 1 USCMA 333, 3 CMR 67. To adopt such a view here would require a determination that the court-martial could not reasonably have concluded that the accused intended merely to inflict great bodily harm to Lieutenant Maguire, but did not intend to kill him. Undeniably the evidence of record is sufficient to support a finding of intent to kill. As a rule of circumstantial evidence, a court-martial is certainly free to infer that a sane person intends the natural and probable consequences of his conduct. See Manual for Courts-Martial, United States, 1951, paragraph 138a. Among the natural and probable consequences of discharging a carbine at an-

**25**

other from a distance of fifteen feet, or less, would certainly be included in the target's death—although happily that particular result did not eventuate in the present instance.

To say, however, that the evidence would *support* a finding of intent to kill is quite distinct from an assertion that it *compels* such a conclusion. For example, in light of the evidence suggesting the complete absence of previous hostility on accused's part toward the victim, Maguire, the court might have concluded that the accused did not intend at all to kill the lieutenant, but merely wished to block his attempt to quell the disturbance created by the former in the mess hall. Thus, among the rational possibilities proper for the court-martial's consideration was a finding that the accused intended only to disable the lieutenant seriously, rather than to kill him. Unfortunately the law officer's instructions misinformed the court-martial to the effect that its members might convict of assault with intent to murder, although they found only an intent to inflict grievous bodily harm. We must conclude, therefore, that the accused was prejudiced as to this finding. Indeed, in assault cases involving similar circumstances and instructions, we would be inclined normally to deem the law officer's error prejudicial—in the absence of a showing that the accused had indicated not only that he intended to shoot his victim, as he did here, but also that he intended to *kill* him.

## IV

The defense contends that the evidence of intoxication produced at the hearing sufficed to raise a substantial issue as to the accused's ability to entertain any sort of specific intent, including one to inflict great bodily harm. We cannot accept this contention. The accused's actions in expressing repeated threats, and in twice obtaining a weapon, destroy any possibility of doubt that he was sober enough to know what he was doing and to intend the foreseeable result. Indeed the accused evidenced no difficulty whatever during his testimony in recalling almost every significant event leading to the transaction in suit. His statement that the only explanation he could assign for his misconduct was that he was drunk signifies to us no more than that intoxication had deprived him of his normal judgment and fear of consequences. His intake of alcohol did not, we believe, operate genuinely to negate his intention to shoot his victim. The fact that the accused did not recall with exactness, or would not admit to, what he had been thinking of when he operated the carbine's firing mechanism disturbs our conclusion in no respect.

The law officer charged court members that intoxication must be considered on the question of intent, although he omitted instruction on at least one included crime not demanding the establishment of specific intent. We consider ourselves wholly unfettered by the law officer's commendable caution in treating intoxication as an issue in the case. And so, with all deference to the power of Korean potables, we do not deem that degree of intoxication to have been presented by the evidence which would create the possibility that the accused might have lacked sufficient mental capacity to entertain a specific intent. United States v. Benavides, 2 USCMA 226, 8 CMR 26.

## V

We turn now to the final issue—that having to do with multiplicity. Disposition of this question requires no lengthy discussion. We have heretofore held that the prejudicial effect of multiplicity is confined to the sentence alone. United States v. Yarborough, 1 USCMA 678, 5 CMR 106; United States v. Soukup, 2 USCMA 141, 7 CMR 17. Thus, if an accused is sentenced on the basis of the maximum penalty for each non-separate offense arising out of a single transaction, prejudice results. In the case at bar, the maximum penalty for assault with intent to commit murder has been set at dishonorable discharge, total forfeitures, and confinement at hard labor for twenty years. Offering violence to a commissioned officer in the execution of his office is a

capital offense, when committed in Korea during hostilities—as it was here. Uniform Code, Article 90, supra; United States v. Bancroft, 3 USCMA 3, 11 CMR 3; United States v. Gann, 3 USCMA 12, 11 CMR 12; Executive Order 10149, August 8, 1950; Executive Order 10247, May 29, 1951. Death, therefore, is the maximum ▇ punishment for that offense. Before the court retired to deliberate on the sentence, the law officer advised its members that the maximum penalty imposable under all charges and specifications ran to dishonorable discharge, total forfeitures, and confinement at hard labor for life. No request for determination of the issue of multiplicity was made at the trial, nor did the defense object to the law officer's statement of the maximum penalty.

Therefore, we need not determine the question of multiplicity here, for it is clear that the only error committed by the law officer operated to benefit the accused. He can hardly complain of that error.

## VI

As to the specification alleging an offer of violence to a superior officer while in the execution of his office, the decision of the board of review is affirmed. As to the remaining specification, we affirm as to the lesser offense of aggravated assault, in violation of the Uniform Code, supra, Article 128 (b) (2), 50 USC § 722. The record is returned to the board of review for possible reassessment of sentence.

Judge LATIMER concurs.

QUINN, Chief Judge (concurring in part and dissenting in part):

I concur in the majority's disposition of the second and third issues, but dissent from that portion of the opinion relating to the instructional error discussed under the first issue.

Doubtlessly, nothing short of an intent to kill will support a charge of assault with intent to murder. Since the law officer instructed the court that the intent required in the instant case was "to kill or inflict great bodily harm,"

he erred. United States v. Floyd, 2 USCMA 183, 7 CMR 59. It does not follow from this, however, that the findings must be reversed. Under ▇ Article 59, Uniform Code of Military Justice, 50 USC § 646, we are required to reverse only if the error materially prejudiced the substantial rights of the accused, unless the error involves a departure from a constitutional norm or a specific command of Congress. United States v. Lucas, 1 USCMA 19, 1 CMR 19. In the case at bar the accused was prejudiced by the erroneous instruction only if it could fairly be said that the court convicted him upon the theory that the evidence failed to establish an intent to kill but did establish an intent to inflict great bodily harm.

The undisputed facts show that the accused, angered by a mess sergeant's rebuke, procured a deadly weapon and announced his intention of shooting anyone who interfered with him. He repeated this threat to the first sergeant and fortified it by loading and aiming the weapon. When the gun was taken from him, he immediately obtained another, expressing an intention of shooting Lieutenant Maguire, his ultimate victim. Then, with the officer before him, he repeated his threats, loaded the weapon, took aim, and fired. In his description of these events, the accused declared that at this point he guessed "he would give him two" and fired again. Only one bullet struck the victim, and it found its mark in the victim's chest.

The nature of the weapon used, the care with which it was aimed, the location of the wound actually inflicted, the announced purpose of the accused, spell out a fixed intent to kill. To find from these unequivocal indications merely an intent to inflict great bodily harm, the court-martial members would necessarily ignore their oath to "faithfully and impartially try [the case], according to evidence, . . . [their] conscience, and the law and regulations provided for trials by courts-martial." It is beyond comprehension that men presumed by their appointment to membership on a court-martial to be the best qualified for such service by reason of

**27**

age, education, training, experience, length of service, and judicial temperament, would discharge their duties with such callous indifference to uncontroverted facts.

The opinions of this Court in United States v. Jenkins, 1 USCMA 329, 3 CMR 63, and United States v. Moynihan, 1 USCMA 333, 3 CMR 67, are of particular significance and I cannot lightly dismiss them from consideration. There we held that when multiple intents are erroneously instructed upon, we would determine whether reasonable minds could be confused or misled as to which intent was indicated by the facts. Since I find no possibility that confusion could result from the facts of this case, I would affirm the decision of the board of review.