UNITED STATES, Appellee

v.

JAMES E. JACKSON, Private First Class,
U. S. Army, Appellant

5 USCMA 584, 18 CMR 208

No. 4957

Decided April 8, 1955

 

LT COL James C. Hamilton, U. S. Army, MAJ Edwin Doran, U. S. Army, and 1ST LT Albert T. Ussery, U. S. Army, for Appellant.

LT COL Thomas J. Newton, U. S. Army, LT COL William R. Ward, U. S. Army, and 1ST LT William G. Fowler, U. S. Army, for Appellee.

### Opinion of the Court

GEORGE W. LATIMER, Judge:

#### I

The accused was convicted by a general court-martial of violating Article 134, Uniform Code of Military Justice, 50 USC § 728. The specification alleged that he, with intent to commit murder, assaulted Private Walter F. Jenkins by shooting at him with an M-1 rifle. He was found guilty as charged and sentenced to be dishonorably discharged from the service, to forfeit all pay and allowances, and to be confined at hard labor for ten years. The convening authority and a board of review left the findings and sentence untouched, and we granted the accused's petition for review to ascertain whether the law officer erred in failing to instruct on the included offense of assault with a dangerous weapon.

#### II

We are here again faced with a record which presents no factual dispute. Stated generally, the evidence establishes that at about 11:00 p. m. on December 25, 1953, the accused was in a cook tent in Company A of a numbered Engineer Battalion on duty in Korea. He had selected the bed of a sergeant as his resting place but, upon the latter's return to his quarters, the accused was moved to the bed of the alleged victim. When the victim appeared and claimed his bunk, the accused was tipped on to the floor. He scrambled to his feet and started toward a corporal but was blocked by Private Jenkins and another occupant of the tent. He was then escorted out of the door by Jenkins, who directed him to proceed to his proper sleeping quarters. A few minutes later, a master sergeant entered the tent and shortly thereafter a projectile ripped through the canvas, missing him by six or eight inches. The sergeant proceeded out through the tent opening and saw a person up an incline about fifty yards away with an M-1 rifle in his hand. He inquired in a loud tone of voice as to who fired the shot, and the answer came back, "It was me, Jackson," and "I was firing at Jenkins and shooting to kill." The sergeant proceeded to the location where he came upon the accused. He disarmed the accused, opened the bolt of the rifle and found a round in the chamber. The weapon gave evidence of having been fired recently, and an expended cartridge together with three or four live rounds were found lying on the ground near the place of firing. The witnesses were consistent in their testimony that the accused had been drinking, but all averred that he was not drunk.

As part of its case, the Government introduced a pretrial statement executed by the accused on the morning following the offense. These are the facts as related by him:

". . . When I got back, I went up to the cook's tent and I was drink-

585

ing some whiskey up there. Then I must of dozed off. I woke up and Cpl Bell was shaking me. I think I was out of my senses. Bell tried to pull me out of the tent and I didn't know if I was in my own tent or not, and me and him had a fight and they pulled us apart. Then I went up to my tent and got my rifle and loaded it and shot down through the cook's tent, and then I waited for someone to come to the door. M/Sgt Land come up on the hill where I was and asked who fired the shot. I told him I fired the shot, that I had trouble with the cooks in the tent. He told me to go to bed and took my rifle."

After the taking of testimony was completed and counsel for the parties had presented their arguments, the law officer instructed the court-martial members on the law of the case. He correctly informed them concerning the principal offense of assault with intent to commit murder, but he became muddled and confused when he attempted to instruct on two of the lesser included offenses. In his charge, he apparently combined some of the elements of assault with a dangerous weapon with those of an assault in which grievous bodily harm is intentionally inflicted. One of the elements he required the court-martial members to consider, if they were to return a finding on an included offense, was that grievous bodily harm was inflicted upon the victim. Of course, no one contended any injuries were suffered by any occupant of the tent, and the instruction was meaningless. After having given his instruction on that one included offense, the law officer announced that he would not instruct on any other lesser and included crime. However, after a five-minute recess and at the request of defense counsel, he instructed on wrongfully and willfully discharging a firearm under such circumstances as to endanger human life. In addition, he informed the court members of the effect of intoxication on specific intent and directed that if accused's mental faculties were so impaired that he could not form a specific intent to kill, a finding on the principal offense could not be returned. Other required instructions were given.

III

Legal principles do not divide the parties on the issue before us. Their dispute centers around the proposition of whether there is evidence to raise reasonably the included offense of assault with a dangerous weapon. Appellate Government counsel contend the record is devoid of the quantity and quality of evidence necessary to require an instruction, while defense counsel assert to the contrary. In connection with that issue, in United States v. Backley, 2 USCMA 496, 9 CMR 126, Judge Brosman, speaking for a unanimous court, explained the degree of intoxication which would permit reduction of an offense to one of a lesser sort. The following language is taken from that case:

". . . Evidence which goes no further than to indicate merely that the accused 'had been drinking,' or that he was 'under the influence of liquor,' is clearly insufficient to require an unrequested instruction on intoxication. At the far swing of the pendulum, testimony or other evidence suggesting that at the time of the alleged offense the offender was the victim of a temporary drunken frenzy, or in what we once described as 'a state of ambulatory stupefaction,' with equal clarity demands such an instruction. These limits, we believe, must be accepted by all. Indeed, it is only the ground between them which is productive of doubt and uncertainty—and perforce of petitions for review by this Court. As to this area, it may suffice to observe that the showing we contemplate as requiring instruction must certainly be one of *intoxication*—and, moreover, intoxication *of a certain degree and sort,* characterized by a discernible relationship to the potential absence of a capacity to entertain specific intent."

Nothing closely approximating that degree of intoxication can be gleaned from the record in this case. While it is conceded there is some evidence that the accused had been drinking, as previously stated, none of the witnesses

testified that he was drunk. On the contrary, all who were present at the time of the shooting testified to the effect that he was not intoxicated. In addition, accused's actions prior to and after the offense reveal that he had not reached that degree of insensibility of mind which would destroy his capacity to entertain a specific intent. After he was awakened on the floor of the tent, he required only minor assistance, if any, to regain his feet and leave the area. He was escorted from the tent, and parenthetically, we might add, his escort may not have treated him too tenderly. He encountered no trouble in climbing a steep hill, despite the fact that it was late at night, snowing, and the ground was icy. He obtained his M-1 rifle and at that time possessed sufficient manual and mental dexterity to load it, aim at a desired target, and fire it into the tent in which he had previously had the altercation. He was mentally capable of understanding and responding to Sergeant Land's question in an intelligent manner, leaving no doubt as to his intent at that time. The following day, he was able to recall the events with sufficient clarity to relate them in detail to the investigators and to reduce his recollections into a coherent statement. The statement itself contains evidence of a capacity to cerebrate, for the accused admits therein that he fired at the tent hoping to entice one of the occupants to appear outside. In view of the fact that he admittedly had trouble with the persons in the tent and that Jenkins had participated in his removal and ordered him to go to his tent, it is not unreasonable to conclude that the accused hoped to isolate his intended victim from the group in the tent and thus obtain a better individual target. As a matter of moment, when the weapon was taken from the accused, a round was in the chamber and it was ready to fire. He certainly had some purpose in mind when he endangered the lives of those he knew were in the tent, and he vividly disclosed it to Sergeant Land. Clearly, had Jenkins been killed at that time, a finding of murder based on intent to kill would be sustainable. In the light of our holdings in previous cases and the undisputed facts and circumstances of this case, we conclude the law officer was not required to instruct on assault with a dangerous weapon as a lesser included offense of that with which the accused was charged.

IV

It is asserted in support of accused's contentions that the weak testimony on intoxication is fortified by other evidence in the record. Specifically, it is suggested that, because the accused and Jenkins had been friends prior to the occurrence of the events which culminated in the offense charged, the accused must have been intoxicated. Otherwise, goes the argument, why would he kill his friend? Obviously, if he was able to think coherently, he must have intended to kill some occupant of the tent, and the record does not show that he had been unfriendly to anyone prior to the altercation in the tent. Although the intended victim could offer no explanation of the accused's expressed wishes to kill him, the record as a whole is more helpful. He had originally chosen the bed of a sergeant as a convenient resting place. When the sergeant wished to retire, the accused was moved to Jenkins' bed. Again it was necessary that he be moved, and to accomplish that he was tipped on to the floor. Shortly thereafter, he got into an argument with a corporal, and Jenkins interfered, escorted him outside of the tent, and told him to go home and go to bed. The sum total of all the incidents, plus the active part taken by Jenkins, might well have been the cause of the accused's sudden animosity. Much of that, however, is beside the point because he audibly and in no uncertain terms announced his feelings. He stated he intended to kill Jenkins, and he nearly succeeded. With the evidence undisputed and with the accused furnishing adequate proof of his intentions, it is a bit difficult to conclude that he had no specific intent to kill. That mental state is not discordant with the other facts found in the record, and we are unconvinced that bizarre conduct, plus some drinking, places intoxication in issue. We, therefore, conclude that an instruction on assault

with a deadly weapon was not demanded.

V

While the conclusion reached above is dispositive of the case, there is another valid reason why the find-
 ■ ing should be affirmed. Defense counsel was afforded full opportunity to review and object to the instructions as given. While we have mentioned that one immaterial instruction was confused, no request for clarification was submitted. Moreover, counsel for the defendant prepared and furnished to the law officer an instruction on the lesser included offense of willfully and wrongfully discharging a firearm under circumstances dangerous to human lives. At the time that instruction was given, defense counsel was fully apprised of the fact that an instruction on assault with a dangerous weapon had not been, and was not going to be, given. The proposed instruction was given as requested, and, while it is doubtful that this offense was raised reasonably by the evidence, a question we need not answer, the accused is not in a position to complain. In view of the activities of defense counsel, we are distinctly impressed with the possibility that he knowingly gambled on leaving the more serious included offense unmentioned to center the court's attention on what, in this instance, might be considered as a minor violation. He must have known that the principal crime charged carried a maximum penalty of twenty years; that assault with a dangerous weapon permitted a sentence of three years' confinement; and that the included offense which he sought to bring into prominence carried only a penalty of one year's confinement. Because of the state of the record, he could not very well assert with conviction that because of intoxication his client could not form the specific intent to kill; but he had reasonable grounds to believe that if the court-martial members would reduce the offense in any degree, they would as readily find the accused guilty of willfully discharging a firearm so as to endanger life as they would that he committed an assault with a deadly weapon upon one of his friends. Under the present state of the record, it is not unreasonable to conclude that defending counsel made a conscious and knowing choice in the instructional area. While he lost, his choice was not without good reason, and the record does not move us to salvage his lost cause.

The decision of the board of review is affirmed.

Chief Judge QUINN concurs.

BROSMAN, Judge (dissenting):

I dissent from the views expressed in the majority opinion and the action taken by my brothers in this case.

II

I am quite unable to predicate affirmance on a single and highly extraor-
 ■ dinary statement which— one witness claims—issued from the accused after the shot in question was fired, and which, it is said, completely removed from consideration the lesser offense of assault with a dangerous weapon. My reading of the record discloses literally nothing else which supports the result reached in the principal opinion.

In essence, the evidence revealed that, on Christmas night of 1953, the accused —who had been drinking heavily—visited a tent occupied by several other soldiers, all of whom appear to have been cooks. He fell asleep atop a bunk there, and efforts to remove him led to fisticuffs between himself and a corporal named Bell. One Jenkins, a friend of the accused, testified that he succeeded in leading the latter from the tent, and watched him as he proceeded up a nearby hill toward his own quarters.

Another witness, a Master Sergeant Land—the accused's platoon sergeant— stated that, as he entered the cooks' tent shortly thereafter, a bullet sped by him. He investigated immediately, and discovered Jackson on the crest of the hill armed with a rifle; and—when Land approached and asked who fired—the former responded "I was firing at Jenkins and shooting to kill."

Later—as Prosecution Exhibit 1— the Government introduced a statement executed on December 26. by the ac-

cused, after proper warning, which related that:

". . . When I got back, I went up to the cook's tent and I was drinking some whiskey up there. Then I must of dozed off. I woke up and Cpl Bell was shaking me. I think I was out of my senses. Bell tried to pull me out of the tent and I didn't know if I was in my own tent or not, and me and him had a fight and they pulled us apart. Then I went up to my tent and got my rifle and loaded it and shot down through the cook's tent, and then I waited for someone to come to the door. M/Sgt Land come up on the hill where I was and asked who fired the shot. I told him I fired the shot, that I had trouble with the cooks in the tent. He told me to go to bed and took my rifle."

No evidence of any nature was offered by the defense.

The law officer correctly instructed the court-martial concerning assault with intent to commit murder. As "the two lesser included offenses" within the language of the specification, he further informed the body's members of the elements of assault whereby grievous bodily harm is intentionally inflicted, in violation of Article 128(b)(2) of the Uniform Code, 50 USC § 722; and those of willful and wrongful discharge of a firearm, in violation of Article 134, 50 USC § 728. It is to be noted that no one was injured in the case at bar—intentionally or the reverse—and, as a result, the first lesser offense instruction was wholly inappropriate. He also advised the court properly of the effect of intoxication on the alleged offense of assault with intent to commit murder, but at no time did he mention the possibility of an assault with a dangerous weapon. See Uniform Code, Article 128(b)(1).

### III

The author of the major opinion makes capital of the argument that evidence of intoxication in a degree sufficient to require an instruction on the issue of drunkenness was not revealed by the record, and that—inferentially—the law officer's charge on intoxication was merely the exercise of a commendable caution on his part. Were the evidence that the accused "had been drinking" the only item favorable to his interests found in this area, I should be much inclined to join him in this position. However, there is somewhat more to the matter as we meet it here.

In the first place, Jenkins—according to his own testimony—was a friend of Jackson, and could offer no sort of explanation of the accused's expressed wish to kill him. Indeed, the latter's scuffle had involved Corporal Bell, and not Jenkins, who in friendly fashion had attempted to assist Jackson to his own tent. Further, the written statement executed by the accused makes no slightest reference to hostility toward Jenkins, or to any purpose to kill him. Cf. United States v. Johnson, 3 USCMA 209, 11 CMR 209; United States v. Lee, 3 USCMA 501, 13 CMR 57.

In short, the intention to kill alleged in the specification rests solely on the accused's remark, which alluded to Private Jenkins and was reported by Master Sergeant Land. It is the presence of this very statement, however, which causes me concern. Eliminating the possibility of intoxication as an issue, the accused's assertion that "I was shooting at Jenkins and shooting to kill"—viewed against the background of circumstances surrounding the event—simply defies human experience.

The accused had fired into an inhabitated tent, and could reasonably have expected prompt investigation by someone therein. I have difficulty in conceiving of a situation in which a sober man, when asked the origin of a certain rifle shot, would be willing to answer as the accused did. If—as the majority maintains—he was mentally capable of understanding and responding to Sergeant Land's question in an intelligent manner, why, I must inquire, did he reply in a style so distinctly *unintelligent*? A statement tailored more perfectly to fit the crime of assault with intent to murder—and therefore a more senselessly incriminating one—would be difficult to devise. If such a self-disserving assertion was not uttered by a man whose senses had been stupefied

beyond reason by alcohol, then it simply must not have been made in the language reported by Land. Indeed, I strongly suspect that the Sergeant's recollection of the accused's words was colored somewhat by the memory of a rifle slug's recent passage near him. Had I sat as a member of the court-martial which convicted the accused, I am sure that I would not have accepted Sergeant Land's version of the accused's statement as uncritically as have my brothers here.

I observe further that the admission of this statement was sharply contested by the defense by reason of a claimed violation of Article 31—and the law officer specifically and elaborately instructed the court that the question of its voluntariness was to be considered by its members, and that they might properly refuse to consider it. Since the chief item of evidence on which the entertainment of a specific intent rested might, therefore, in accordance with the law officer's direction, have been disregarded by the members of the court—totally or in part—it is the more difficult to conclude that the possibility of guilt of the lesser offense of assault with a dangerous weapon was not reasonably raised. As we have remarked in earlier cases, it is an exceedingly troublesome matter in most situations to establish that an accused genuinely intended not only to injure his victim, but also to kill him. See United States v. Christensen, 4 USCMA 22, 15 CMR 22; United States v. Holman, 3 USCMA 396, 12 CMR 152. This statement seems markedly appropriate within the present context.

IV

My brothers advance a further argument to the effect that the defense waived whatever right it may have enjoyed to an instruction on the offense of assault with a dangerous weapon by its failure to request such a charge, and by asking instead that the court be instructed on another lesser offense—that of willful and wrongful discharge of a firearm. After a detailed, thoughtful and realistic examination of the record, I remain unconvinced that the lawyers for the accused were moved by any sort of purpose that the court should choose only between the "all" of an assault with intent to commit murder, and the comparative "nothing" of the offense of willful and wrongful discharge of a firearm. Indeed, it is entirely probable that they—like the law officer himself—were thoroughly muddled with respect to the distinction between the aggravated assault violative of Article 128(b)(1) and that set out in 128(b)(2). It will be recalled that the latter, which was palpably inapplicable under the facts of the case, was used by the law officer as a basis for instructions.

V

In light of the foregoing, I would hold here that the findings may not lawfully be affirmed, and would order that the record of trial be returned to The Judge Advocate General, United States Army, for appropriate action. This action, of course, could take the form either of the direction of a rehearing, or of an affirmance of guilt of assault with a dangerous weapon, together with a reassessment of sentence.