UNITED STATES, Appellee

v.

RAYMOND W. SMITH, Corporal, U. S. Army, Appellant

6 USCMA 13, 19 CMR 139

Lt Col Edward Duvall, U. S. Army, for Appellant.

Lt Col Thomas J. Newton, U. S. Army, and 1st Lt A. Kenneth Pye, U. S. Army, for Appellee.

## Opinion of the Court

Robert E. Quinn, Chief Judge:

Upon his conviction for the premeditated murder[1] of a fellow-soldier, robbery,[2] and aggravated assault,[3] the accused was sentenced to dishonorable discharge, total forfeitures, and confinement at hard labor for life. Intermediate appellate tribunals have affirmed the findings and sentence, and we granted the accused's petition for review to consider a single issue relating to the murder charge only.

The facts upon which the charges are predicated are painfully clear. On the afternoon of August 8, 1954, Sergeant T. J. Ramsey and several of his friends were at a bar in Augsburg, Germany. At about four o'clock, Elfriede Reisner, who was to meet Ramsey there, entered. Rather than join him, however, she went directly to another section of the establishment where she met the accused. While the pair were together, one of Ramsey's friends informed Elfriede that Ramsey wanted to see her. She went to Ramsey and, according to her testimony, was asked to join him. She declined and returned to her table. Shortly thereafter, the accused took her out, and the couple entered a taxi to go to another bar. While the taxi was at the curb, Sergeant Ramsey opened the door and asked Elfriede to get out. When she refused, he slapped her and left. Thereafter, the pair departed for their original destination. Upon arriving, the accused let the girl out telling her he was returning to the Kaserne to sleep. He then directed the driver to the Kaserne. As they neared it, the accused ordered the driver to stop a short distance beyond the gate and wait for him. He then approached the gate and showed the guard his pass. When the guard told him to enter, the accused pressed his hand, or a sharp instrument, into the guard's back telling him not to move and took the guard's .45 caliber pistol from him. He then ran back to the taxi, ordering the driver, at gun-point, to return to the original point of departure. En route, the accused continually repeated the words, "I'll kill him." They arrived at the bar again about thirty-five minutes after leaving it. There the accused quickly dismounted and entered. Once inside, he went directly to Ramsey and, after saying to him "you are not going to slap anybody else's old lady," drew a pistol. His first shot went astray, but the second struck Ramsey who fell to the floor. The accused came closer and fired two more rounds into the prostrate body; holding the others at bay with his pistol, he left the establishment. Outside, an unidentified soldier was heard to say that Ramsey was not dead. Thereupon, the accused said, "I'm going back to finish him." When he reentered, he was informed that Ramsey was in fact dead. He told his informant to summon the military police, for "I killed him and therefore I go to jail." He waited outside the bar. Upon the arrival of the military police, he surrendered to them without a struggle.

Elfriede Reisner described the victim as a vicious individual who had broken her arm during their first encounter some six months prior to the killing.

---

[1] Article 118, Uniform Code of Military Justice, 50 USC § 712.

[2] Article 122, Uniform Code, supra, 50 USC § 716.

[3] Article 128, Uniform Code, supra, 50 USC § 722.

This attack was not reported because of Ramsey's threats. An agent of the Criminal Investigation Division reported that the deceased was well known to that agency for he was investigated in connection with an attack upon another German girl, and was also involved in a narcotics matter.

Testifying in his own behalf, the accused asserted that he had arrived in Augsburg at 9:00 o'clock that morning. The morning was spent at various bars in which the accused and his friends consumed beer. He met Elfriede, and a date for the afternoon was made. As the day wore on, they progressed to wine, cognac, and finally gin. Asked by his counsel whether he was very drunk after all this drinking, he replied, "Yes, I imagine I was." The accused further testified that Elfriede joined him as agreed. When they were together a short time, they were joined by one of Ramsey's friends, who told the accused Elfriede was Ramsey's girl and he would "razor whip" her if he found her with another man. Later when Elfriede asked to leave because she was afraid of the deceased, he hailed a taxi. Ramsey followed them out and struck Elfriede saying, "girl, what did I tell you." The accused told him to stay away from the girl, but Ramsey and his friends stood there laughing. This angered the accused. He supplied no account of the events occurring beyond this point.

The law officer outlined the essential elements of the offenses charged. He described unpremeditated murder and voluntary manslaughter as lesser-included offenses under the murder charge, and detailed their elements. He concluded this portion of the instructions with the following:

"In this case there has been some indication that the accused may have consumed intoxicating beverages shortly before the time the offenses are alleged to have been committed and that the accused may have been intoxicated to some degree at the time of the alleged offenses. You are advised that a temporary loss of reason which accompanies and is part of a drunken spree, and which is not

the result of delirium tremens or some other mental defect, disease, or derangement is not insanity in the legal sense. It is a general rule of law that voluntary drunkenness not amounting to legal insanity, whether caused by liquor or drugs, is not an excuse for crime committed while in that condition; but such drunkenness may be considered as affecting the mental capacity to entertain a specific intent when it is a necessary element of that offense. Evidence of drunkenness should be carefully scrutinized, as drunkenness is easily simulated or may have been resorted to for the purpose of stimulating the nerves to the point of committing the act."

In a restatement of well-established principles, paragraph 154a(2), Manual for Courts-Martial, United States, 1951, provides:

"A temporary loss of reason which accompanies and is part of a drunken spree and which is not the result of delirium tremens or some other mental defect, disease, or derangement is not insanity in the legal sense. It is a general rule of law that voluntary drunkenness not amounting to legal insanity, whether caused by liquor or drugs, is not an excuse for crime committed while in that condition; but such drunkenness may be considered as affecting mental capacity to entertain a specific intent, or to premeditate a design to kill, when either matter is a necessary element of that offense."

It is readily apparent that the law officer included this portion of the Manual in his instructions upon the effect of intoxication. He followed the quoted portion verbatim until he arrived at the phrase dealing with premeditation. At that point, we find a juxtaposition of language resulting in the complete eradication of the subject of premeditation despite the presence of a specification in which premeditation is an essential element. This omission, the defense counsel contends, was prejudicially erroneous. The validity of this contention presents the single issue with which we are here concerned.

In United States v. Roman, 1 USCMA 244, 2 CMR 150, a unanimous court declared:

".  .  . [W]e believe the better rule to be that if an accused is charged with premeditated murder and there is evidence that he was intoxicated to such an extent that the court-martial could reasonably find that he could not deliberate and premeditate over the intent to kill . . . an instruction on the effect of his intoxication should be given."

Doubtlessly, this is a rule dictated by caution. But, as we have often declared, a bare showing that ▪ the accused had been drinking, or a mere claim that he was intoxicated, without evidence that his conduct was in any way affected, is insufficient to raise the condition to the level of an affirmative defense. United States v. Backley, 2 USCMA 496, 9 CMR 126; United States v. Benavides, 2 USCMA 226, 8 CMR 26; United States v. Jackson, 5 USCMA 584, 18 CMR 208.

In the instant case, the only factors indicating intoxication are decidedly weak. It is mentioned ▪ for the first time in the testimony of the accused, who, after describing a day devoted to drinking intoxicants of varying potency, was asked by his counsel: "After all this drinking were you very drunk then?" He replied, "Yes, I imagine I was." Opposed to this single reference to what is now urged upon us as an affirmative defense to the charge of premeditated murder are a number of considerations, sufficient, in their entirety, to compel the conclusion that intoxication was not fairly raised by the evidence. No prosecution witness referred to the accused's condition during the course of direct examination. The defense counsel did not allude to this condition in his cross-examination of adverse witnesses, nor did he seek to elicit any information on the subject from the defense witnesses, although one of them, Elfriede Reisner, had spent a considerable part of the day with the accused. The accused's clear recollection of the events leading up to the point where he became angered by Sergeant Ramsey's brutality belies any lack of capacity to think clearly. Finally, the undisputed evidence of what occurred after the slapping convincingly destroys any serious contention that the accused's ability to premeditate was in any way impaired. He first dismissed the girl he very obviously desired to be with by explaining his purpose of returning to his barracks to rest. By this explanation, he obviated any protests to his ultimate aim from that source. Upon arriving at the Kaserne, he significantly directed the driver to stop at a place where he could not be observed by the sentry on duty, and demonstrated that his purpose had been formed by ordering him to wait. He then showed the sentry a valid pass, pretending to seek admission. With the sentry's vigilance relaxed, he quickly and effectively relieved him of his pistol and ordered him away from the gate. This course of conduct, through the completion of the killing, shows purposefulness and nothing else. He sought out his victim in a crowded bar. Despite evasion tactics by Ramsey, his second bullet found its mark. He fired two additional rounds when Ramsey was helpless. Informed that Ramsey was not dead, he returned proclaiming his intention of completing the job. When he learned that Ramsey was dead, he acknowledged the criminal nature of his acts and made no effort to elude the police.

In the face of these uncontested facts, we need not determine whether the law officer's omission of all mention of the effect of intoxication upon the accused's ability to premeditate was prejudicially erroneous. That subject was not fairly raised by the evidence, and the accused was not harmed by any otherwise misleading statements found in the law officer's instructions on the subject.

The decision of the board of review is affirmed.

Judges LATIMER and BROSMAN concur.