UNITED STATES, Appellee

v

DONALD L. MORPHIS, Private E–2, U. S. Army, Appellant

7 USCMA 748, 23 CMR 212

No. 8735

Decided April 26, 1957

First Lieutenant Robert J. Hearon, Jr., argued the cause for Appellant, Accused. With him on the brief was Major Frank C. Stetson.

First Lieutenant Edward S. Nelson argued the cause for Appellee, United States. With him on the brief were Lieutenant Colonel Thomas J. Newton, Captain M. Douglas Hodges, Captain Thomas J. Nichols, and First Lieutenant Lewis W. Evans.

## Opinion of the Court

HOMER FERGUSON, Judge:

The accused was convicted by a general court-martial sitting in Germany of premeditated murder, a violation of Article 118, Uniform Code of Military Justice, 10 USC § 918. He was sentenced to a dishonorable discharge, total forfeitures, and life imprisonment. The findings and sentence were approved by the convening authority and a board of review. We granted review to determine the following issues:

(1) Whether the admission of testimony that the accused had threatened to kill "someone" the night before the homicide was prejudicial.

(2) Whether the law officer erred in instructing the court that a find-

ing of guilty of premeditated murder required the concurrence of only two-thirds of the members present at the time the vote was taken.

(3) Whether the instruction that the court-martial could consider evidence of voluntary drunkenness if they found "beyond a reasonable doubt that such condition existed" was prejudicial.

Two statements of the accused were admitted into evidence, one of which recounted the details of the crime. It seems that some time after the accused arrived in Germany, he acquired an active dislike for the victim, a German cab driver. He had availed himself of this driver's services a number of times. On one occasion, the accused, in company with five other soldiers, attempted to board the decedent's cab. The driver, however, refused to take more than four of the soldiers. (The accused was obese. His commanding officer had for sometime prior to the offense attempted to prevail upon him to reduce.) The driver's refusal upset the accused, and eventually led to the slaying. In one of his pretrial statements the accused recounted his prior feelings toward the victim and related the incident as follows:

". . . Upon all six of us getting into the taxi, the driver remarked that he could only take four of us. I then asked him why he could'nt [sic] take more and he replied that it was unauthorized to take more than four passengers. I then talked to him for awhile and tried to get him to take the other two men who were with us but he still refused to comply with my wishes. Being that he would not take the other two men we all four got out of the taxi and we paid him DM1.00 for his coming up there. Then all six of us walked down to the Hauptpost, Darmstadt. We stayed at the Hauptpost for awhile drinking beer. After staying here for about one or two hours I decided to return to camp so I left the other five men inside the gausthaus and proceeded toward the taxi stand by the monument. Upon arriving there I noticed that this same taxi driver who had refused to take the six of us earlier in the evening was loading four soldiers with there [sic] girlfriends making a total of eight people. I then got in the taxi which was directly behind his. Upon getting in I noticed that the driver did not make anyone of these eight people get out, therefore I felt a dislike for him very much since I had treated him fairly each time I received services of his. About two weeks after this incident I met this taxi driver at the taxi stand at the Hauptpost where I discussed with him the fact that I had observed him taking eight passengers on the same night that he refused to take I and five other men from the Sports Cafe. He told me that he did'nt [sic] remeber [sic] doing this and if he did it was his business. Then there was another incident about one and half months ago when I was at the Oase's. I was here drinking with four other men all of whom were from the 216th FA Bn. I don't remember but one of there [sic] names and his name was Pfc Louis DUNSON. I know him because he is from my home town. Anyhow, upon getting this same taxi-driver on this night again this same driver refused to transport the five of us. We then just left him and went to another taxi which was in front of the Oases and he took all five of us back to Ernst Ludwig Kaserne. Remembering all these incidents in which this taxi driver has been unfair I have developed a great dislike for him. The next time I saw this driver was on the night of 13 November 1955. On this evening of 13 November 1955, I had been drinking beer at the Hauptpost and then at the Oases. . . . I went over to the taxi stand by the monument where I got the first taxi in line. The driver was standing outside the taxi and I noticed at this time that it was the same driver with whom I had developed a great dislike for. I opened the drivers door and sat in the rear seat directly behind the driver. Then the driver got into the cab and I told him to take me to Ernst Ludwig Kaserne. During this evening I had the knife which was shown to me by

Investigator SCOTT in my inside right hand pocket of my Ike Jacket. After crossing over the bridge which is about 300–400 feet from the Kelley Barracks entrance these incidents of this taxi driver came back to me so I got the feeling that I wanted to hurt this man enough that in the future he would not be unfair with me. I therefore took this knife out of my pocket with my left hand and placed it in right hand. Then just after we crossed the bridge I stabbed him in the left shoulder. After doing this he turned around and started to grab me over the back seat. As he did this I stabbed him several times in the chest. At this time I noticed all the blood coming from him and I became scared. I therefore left him lying face down with his face resting on the rear seat of the taxi and his legs hanging over the front seat. I pushed the front drivers seat forward and got out of the car from the drivers door. I then ran behind the taxi and into a yard which was to the right rear of the taxi. After going behind this house which was in the yard here I heard a dog barking. After going behind the house I turned around and walked past a door of this house where a man was standing with a dog and a woman. I walked between the man with the dog and the woman. At this time I did not have my hat as I lost it in the taxi. Upon hitting the main road I walked past the taxi and glancing over my right shoulder I noticed several people looking inside the taxi. I kept right on walking to the other side of the street and walking toward Ernst Ludwig Kaserne. I realized that my hat was in the taxi after I reached down for it under my belt while walking past the taxi. I then entered the main gate of Ernst Ludwig Kaserne and was waved on in by the guard. I then went directly to my room where I pulled off my jacket. I then went to the wash room where I washed the blood off my hands. I then went to the orderly room and turned my pass in. The C.Q. who was SP 3 BURCHILL, directed me to place my pass in the box. The C.Q.

was talking to Pvt CURTIS at this time. After signing in I returned to my room and placed my jacket which was bloody in my laundry bag, also my trousers which had blood stains. . . ."

The victim suffered at least ten stab wounds, two of which punctured the chest cavity and could have caused death. The autopsy official also testified that the other wounds were probably contributory to the victim's death due to the loss of blood.

Two nights preceding the slaying, the accused had purchased from another soldier the murder weapon, a ten-inch dagger-type knife with a six-inch blade. The evening prior to the homicide the accused, while in a gasthaus drinking with friends, displayed the weapon, stating, "I am going to kill somebody."

I

The accused complains of error because the law officer admitted into evidence—without an objection from the trial defense counsel—testimony that the night preceding the slaying the accused displayed the murder weapon and declared, "I am going to kill somebody." As a general rule, to be admissible, a threat must be delivered under such circumstances as to indicate a hostile purpose upon the part of the accused. Also, the language used, or the circumstances under which it is made, must show that the threat was directed at the victim or against a class of persons to which the victim belonged. If the threat was not directed against the victim—but was general—the burden is on the prosecution to show that the threat was directed against the victim or against a class of which he was a member. However, in the final analysis, whether or not the threat was so directed is a question which must be determined by the fact finders. See Wharton, Criminal Evidence, 12th ed, § 195. This rule has been either strictly interpreted, allowing in only threats which have a definite connection with a certain person, or class of persons (Bird v United States, 180 US 356, 21 S Ct 403, 45 L ed 570)

or liberally interpreted, admitting even general and indefinite threats. Wigmore, Evidence, 3d ed, § 106. In either instance the probative force of the threats is a jury question. 26 Am Jur, Homicide, § 357. Of course, the more specific the threat, the greater its probative value.

However, the present case falls within neither of the general rules. The testimony of the witnesses that ▮▮▮ the accused on the night preceding the homicide had exhibited the knife and had declared he was going to kill someone tended not only to prove that the accused had the murder weapon in his possession at the time but that he also intended to use it. We feel that under circumstances such as these the court must determine what connection, if any, the threat had with the subsequent homicide. This thinking was reflected by the court in People v Sutherland, 154 NY 345, 48 NE 518. In that case the defendant shot and killed one Sarah Wren, with whom he had been living in adultery. The only question before the court was "whether the evidence produced upon the trial was sufficient to establish the intent to kill, and the deliberation and premeditation essential to constitute the crime of murder in the first degree." The prosecution proved by a witness, who had a conversation with the defendant the afternoon of the day of the killing, that the defendant showed the witness a pistol, remarking, "This means business someday." Judge O'Brien, speaking for the New York Court of Appeals, held the statement admissible, saying:

". . . The testimony of this witness tended to prove, not only that the defendant had the pistol in his possession at the time, but that he intended to use it upon some one. Whether for the purpose of protecting himself against the husband of the woman with whom he was living, or upon the deceased, was for the jury to say under all the circumstances of the case."

In view of the foregoing we hold that the admission of the statement into evidence was proper.

752

## II

The next argument presented by the accused is that the law officer's instruction that only a concur- ▮▮▮ rence of two-thirds of the members present at the time the vote is taken is required to reach a finding of guilty of premeditated murder, is error for the reason that a guilty finding of that offense carries a mandatory life sentence—which sentence requires a three-fourths concurrence therein. The difficulty with the accused's reasoning is his failure to recognize that an action on the finding and an action on the sentence are distinct and, with respect to the findings, only two-thirds concurrence is required by the statute to reach a finding of guilty, except in those offenses calling for the death penalty. The statute here is plain and unambiguous. Article 52, Uniform Code of Military Justice, 10 USC § 852, reads:

"ART. 52. Number of votes required.

"(a)(1) No person may be convicted of an offense for which the death penalty is made mandatory by law, except by the concurrence of all the members of the court-martial present at the time the vote is taken.

"(2) No person may be convicted of any other offense, except by the concurrence of two-thirds of the members present at the time the vote is taken.

"(b)(1) No person may be sentenced to suffer death, except by the concurrence of all the members of the court-martial present at the time the vote is taken and for an offense in this chapter expressly made punishable by death.

"(2) No person may be sentenced to life imprisonment or to confinement for more than ten years, except by the concurrence of three-fourths of the members present at the time the vote is taken.

"(3) All other sentences shall be determined by the concurrence of two-thirds of the members present at the time the vote is taken."

It is a basic principle that absent any apparent ambiguity it is unnecessary to invoke rules of statutory construction. Russell Motor Car Company v United States, 261 US 514, 43 S Ct 428, 67 L ed 778; Caminetti v United States, 242 US 470, 37 S Ct 192, 61 L ed 442.

In Stout v Hancock, 146 F2d 741 (CA 4th Cir) (1944) Article of War 43, predecessor of the present Article, was being considered. The court noted that if there was any difficulty in sentencing under the Articles of War, the matter must be addressed to the legislature, not the courts, for solution.

"There is an apparent inconsistency in permitting a conviction on a two-thirds vote for a crime which must be punished by death or life imprisonment under article 92 and at the same time requiring a unanimous vote to impose the sentence of death and a three-fourths vote to impose the sentence of life imprisonment; but inconsistency is more apparent than real. Conviction and sentence are two separate steps in a court-martial proceeding (Winthrop's Military Law and Precedents, p. 392); and, after conviction has been voted in a prosecution for murder or rape, the only punishments permissible under the law are death and life imprisonment. The vote on punishment, therefore, is but a choice between these two; and, unless there is a unanimous vote in favor of the death penalty, life imprisonment necessarily follows. It is only where conviction must be followed by that penalty that it is important that a unanimous vote be required for conviction; and this, we think, is all that Congress intended.

"Nor do we feel impelled to put a different interpretation upon article 43 because of the possibility that in voting punishment under article 92 the court-martial, while failing to vote unanimously for death, might fail to give a three-fourths vote for life imprisonment. The question before us is the interpretation of article 43; and we would not be justified in putting a strained construction on that article, which would result in real difficulties in sentencing under the other eleven articles to which we have referred, in order that we may avoid fanciful difficulties in sentencing under article 92. *If there is any real difficulty in sentencing under that article, the matter is one which addresses itself to Congress and not to the courts.*" [Emphasis supplied.]

In Ex Parte Campo, 71 F Supp 543 (SD NY) (1947), the court had a similar problem before it:

"If an accused is found guilty by a two-thirds vote the Manual for Courts-Martial provides that each member of the court shall vote on the sentence to be imposed regardless of his vote of guilt or innocence and the sentence must be determined by a three-fourths vote.

"The petitioner complains that this procedure may compel a member to vote on the sentence irrespective of the fact that he may have voted against conviction and this may be against the member's 'conscience and thereby prohibit the free exercise of his religion' in violation of the First Amendment to the Constitution of the United States. The vote on conviction and the vote for the proper sentence for the offense of which the accused had been found guilty by the court are separate steps in the proceeding before the court-martial. A vote on a proper sentence for the offense is entirely distinct from a vote on the charges. There is no inconsistency in requiring a two-thirds vote for conviction and a three-fourths vote for sentencing. Stout v Hancock, 4 Cir., 146 F. 2d 741 certiorari denied 325 U. S. 850, 65 S. Ct. 1086, 89 L. Ed. 1971; Hurse v Caffey, D. C., 59 F. Supp. 363."

When we study the history of the present Code provisions, it seems quite clear that Congress has only provided for a special vote requirement in one instance on the findings and that is where the death sentence is mandatory. At first, under the Articles of War of 1776, and 1786, only a majority vote was required for both the findings and sentence, even where the death penalty could be inflicted. In 1806 the rule regarding the death penalty was

**753**

changed to a two-thirds vote. Then in 1916 the law was changed to provide for a two-thirds concurrence in the findings in cases where the death penalty was mandatory. Then final evaluation, with respect to the findings, was made in 1920 wherein it was provided that in those cases where the death sentence is mandatory, a unanimous vote is required to convict and sentence (Article of War 43, 10 USC (1946 ed) § 1514). This latest revision of the findings is the one in force today, and absent Congressional mandate, we cannot change the law with respect thereto. Accord, United States v Walker, 7 USCMA 669, 23 CMR 133.

### III

The final problem before us is the law officer's instructions on the effect of voluntary intoxication as it affects the accused's ability to premeditate. The law officer, in an out-of-court conference called for the purpose of discussing proposed instructions, informed counsel of his intent to "instruct on the effect of voluntary intoxication." There was no objection to this proposed instruction. When the court reopened, the law officer gave the following instructions on the question of voluntary intoxication:

"With reference to the evidence tending to show that the accused was intoxicated, it is a general rule of law that drunkenness not amounting to legal insanity, whether caused by liquor or drugs, is not an excuse for crime committed while in that condition, but such drunkenness may be considered as affecting mental capacity, insofar as this case is concerned, to entertain the premeditated design to kill. *I instruct you, therefore, that you may consider the evidence of voluntary drunkenness in this case if you find from the evidence beyond a reasonable doubt that such condition existed.*

"In determining whether the accused had sufficient mental capacity to entertain the premeditated design to kill involved in this offense of premeditated murder, the fact that a person was intoxicated at the time he committed an offense does not neces-

sarily show that he was deprived of his reason and ability, for a person may be drunk and at the same time be aware of his acts, and their nature, and their probable consequences. *The question raised by the evidence of voluntary drunkenness and presented for your determination is whether the accused was intoxicated to such a degree as to render him mentally incapable of entertaining a premeditated design to kill.*

"There is other evidence in this case which you may properly weigh *against the evidence of voluntary drunkenness* in determining the accused's ability to entertain this premeditated design to kill, such as the evidence tending to show that immediately after the alleged assault upon the victim, the accused fled the scene and returned to his barracks area by devious paths; the accused's ability later, and here in court, to remember certain of the details surrounding the alleged offense; and the fact that others saw him at intervals after the alleged offense and did not believe that he was intoxicated.

"In the light of all the evidence, if you have a reasonable doubt that the accused was mentally capable of entertaining a premeditated design to kill by reason of voluntary drunkenness, you must find him not guilty of the offense of premeditated murder. In such event, you may find the accused guilty of unpremeditated murder, if you so find that that offense was committed by the accused beyond a reasonable doubt from the evidence." [Emphasis supplied.]

In the accused's pretrial statements, he stated that he had consumed sixteen bottles, or approximately twenty glasses, of beer during the evening in question. His testimony at trial revealed that he had been drinking on the evening in question although he made no specific claim that he was intoxicated. Exculpatory statements found in an accused's pretrial statement have been held sufficient to frame an issue unless such statements are inherently improbable and unworthy of

754

belief. United States v Johnson, 3 USCMA 209, 11 CMR 209.

That the law officer is bound to instruct on all affirmative defenses raised by the evidence is so well-settled that it requires no citation of authority by us. Here, the law officer was of the opinion that the evidence of voluntary intoxication was sufficient to raise the affirmative defense of intoxication in relationship to the accused's ability to entertain a specific intent. The necessity of instructing on affirmative defenses must be determined initially by the law officer in the exercise of his sound discretion. United States v Beasley, 3 USCMA 111, 11 CMR 111. For us to say that such defense was not raised by the evidence would require a holding that the law officer had abused his discretion by instructing on the question of intoxication. This we are not disposed to do. We cannot substitute our judgment for that of the law officer who saw and heard the witnesses and the evidence presented at trial, and on that basis framed the issue of intoxication presented to the court—without objection from counsel. Reasonable minds could not conclude that as a matter of law the affirmative defense of voluntary intoxication was not raised by the evidence. To do otherwise would place us in the role of fact finders—a function which is beyond the scope of appellate authority granted us by the Code. Article 67, Uniform Code of Military Justice, 10 USC § 867.

In assessing the prejudicial effect of the instructional error here complained of, we turn to our recent decision in United States v Noe, 7 USCMA 408, 22 CMR 198, where we held that a law officer's instruction which shifted the burden of proof with respect to the accused's defense was error and "The law is well-settled that the 'instruction as a whole' test is inapplicable where the court has been instructed both rightly and wrongly on a material issue. The correct instruction does not cancel out the prejudicial taint of the erroneous one." The law officer's instruction was clearly erroneous because it required the accused to assume the burden of proof beyond a reasonable doubt in order to prevail. From the reading of the instructions as a whole it is apparent that the court members could reasonably have been misled by the erroneous advice. United States v Connell, 7 USCMA 228, 22 CMR 18. In discussing the effect of an erroneous instruction given by the law officer in United States v Stewart, 7 USCMA 232, 22 CMR 22, we had occasion to lay down the following principle which takes on specific meaning when applied to the instant case:

". . . The accused has no mechanical apparatus, capable of extrasensory perception, with which he can accurately gauge the contents of the court's collective mind. If there is a reasonable probability that prejudice resulted, the findings must be set aside. Little v United States, 73 F 2d 861 (CA 10th Cir) (1934)."

In view of the foregoing, we hold the law officer erred in his instructions on voluntary intoxication and such error prejudiced the substantial rights of the accused. Because of this instructional error we reverse the findings and sentence and return the record of trial to The Judge Advocate General of the Army for reference to a board of review, which may order a rehearing on the charge of premeditated murder or affirm a conviction of the lesser offense of unpremeditated murder and assess an appropriate sentence for the findings affirmed.

Chief Judge QUINN concurs.

LATIMER, Judge (concurring in part and dissenting in part):

I concur in part and dissent in part.

I agree that the law officer did not err in admitting evidence of the statement made by accused the night before the homicide, and that the concurrence of only two-thirds of the court members present and voting is sufficient to convict for premeditated murder.

However, I do not agree that the accused was prejudiced by the law officer's instructions on voluntary intoxication and in so holding the majority overrules in silence two distinct and well-defined lines of cases. Since the

**755**

beginning of this Court, we have consistently adhered to the rule that a law officer is not required to instruct on either an included offense or an affirmative defense unless it is reasonably raised by the evidence. United States v Clark, 1 USCMA 201, 2 CMR 107; United States v Simmons, 1 USCMA 691, 5 CMR 119. Accordingly, unless the defense of voluntary intoxication was reasonably raised by the evidence, the accused was given an instruction to which he was not entitled, and cannot possibly have been prejudiced thereby even though the instruction was erroneous.

In this case the only evidence conceivably pointing toward intoxication is in the pretrial statements by accused. While he indicates that he may have consumed as much as sixteen bottles or twenty glasses of beer over a prolonged period of time before the killing, he specifically and positively disclaimed being intoxicated. In addition, his actions at the time of the offense indicated a capacity to think clearly, and his second pretrial statement makes it plainly evident that he recollected the events which transpired at that time. We have repeatedly held that mere evidence of drinking, coupled with a claim of intoxication, without more, is not sufficient to entitle an accused to instructions on intoxication. United States v Smith, 6 USCMA 13, 19 CMR 139; United States v Jackson, 5 USCMA 584, 18 CMR 208. Here, not only is there the absence of a claim of intoxication, but a specific disavowal by the accused which fortifies the other evidence that he was in full possession of his faculties. Certainly, it is worth noting that defense counsel could not reasonably argue the defense of intoxication, for to do so would impeach his own client, yet we reverse on the theory that it was in issue. Accordingly, it strikes me that we have taken a large step backward by holding that this accused is entitled to a reversal because the law officer gave an erroneous instruction on intoxication.

Not being content with overturning that line of authorities, my associates go on to overthrow another group of cases which announce what I believe to

be good law. See United States v Christensen, 4 USCMA 22, 15 CMR 22; United States v Sharp, 5 USCMA 580, 18 CMR 204; United States v Rodriguez-Suarez, 4 USCMA 679, 16 CMR 253. Here the Court holds that because the law officer instructed on intoxication, we cannot go behind his ruling. Of course, that is not now the law and it should not be proclaimed as such. To place him in that instructional straitjacket makes it extremely hazardous for him to be generous with an accused. One of the shortcomings of the military judge is his hesitancy to be freehanded with an accused and, after this decision becomes the law, I can envisage no liberalization.

One of the best ways in which I can support my views is to quote from the opinion in United States v Christensen, supra, authored by Judge Brosman, who, when speaking for a unanimous court on this issue, stated (page 26):

"The law officer charged court members that intoxication must be considered on the question of intent, although he omitted instruction on at least one included crime not demanding the establishment of specific intent. We consider ourselves wholly unfettered by the law officer's commendable caution in treating intoxication as an issue in the case. And so, with all deference to the power of Korean potables, we do not deem that degree of intoxication to have been presented by the evidence which would create the possibility that the accused might have lacked sufficient mental capacity to entertain a specific intent. United States v Benavides, 2 USCMA 226, 8 CMR 26."

In all of the cases involving the giving of instructions on included offenses or affirmative defenses, we have considered the oft-repeated argument that we cannot weigh facts. I suppose we have rejected that contention times without number because, when we review the evidence in a record, we have the power to ascertain whether there is sufficient as a matter of law to support a finding of guilt or to raise an issue on a theory of defense. If that involves the weighing of evidence, then the cases are

legion to the effect that an appellate court may consider evidence for those limited purposes.

Accordingly, I conclude that the instruction was a gratuity, given to accused by the law officer out of an abundance of caution in a capital case. Accused was not entitled to have the court consider the theory or the effect of intoxication, for the issue was not raised by the evidence, and hence he could not possibly have been prejudiced by the instruction.

I would, therefore, affirm the decision of the board of review.