UNITED STATES, Appellee

v

RONALD L. VOGEL, Sergeant,
U. S. Marine Corps, Appellant

18 USCMA 160, 39 CMR 160

No. 21,311

March 14, 1969

*Lieutenant David E. Miller*, JAGC, USNR, argued the cause for Appellant, Accused.

*Commander Walter F. Brown*, JAGC, USN, argued the cause for Appellee, United States. With him on the brief was *Colonel C. R. Larouche*, USMC.

## Opinion of the Court

QUINN, Chief Judge:

The accused's conduct, while serving as a squad leader of a night combat patrol in Vietnam, led to his trial by a general court-martial for unpremeditated murder of a five-year-old child and rape, in violation of Articles 118 and 120 of the Uniform Code of Military Justice, 10 USC §§ 918 and 920, respectively. He was convicted as

charged, but the convening authority dismissed the rape charge and reduced the sentence adjudged by the court-martial to dishonorable discharge, confinement at hard labor for thirty-five years, and accessory penalties. A board of review affirmed the findings of guilty but further reduced the period of confinement to twenty years. On this appeal, the accused contends he was prejudiced by the admission in evidence of a pretrial statement made by him to a criminal investigator, and by other evidentiary rulings of the law officer.

At trial the accused contended, as he contends on this appeal, that when he was questioned by the criminal investigator he was given incomplete preliminary advice as to his right to counsel during questioning, as that right is explicated in Miranda v Arizona, 384 US 436, 16 L Ed 2d 694, 86 S Ct 1602 (1966). See also United States v Tempia, 16 USCMA 629, 37 CMR 249.

Threshold warning as to the right to remain silent and the right to counsel during questioning is ■■■■■■ ■ required in situations in which the individual is "subjected to custodial police interrogation." Miranda, supra, at page 439. The Supreme Court has defined custodial police interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id., at page 444. Conversely, it is not required in situations in which the individual is not subject to a police dominated atmosphere and is patently unfettered in his decision to speak or to remain silent. Frohmann v United States, 380 F2d 832 (CA8th Cir) (1967), certiorari denied, 389 US 976, 19 L Ed 2d 469, 88 S Ct 478 (1967); Mackiewicz v United States, 401 F2d 219 (CA2d Cir) (1968), certiorari denied, 393 US 923, 21 L Ed 2d 258, 89 S Ct 253 (1968). One situation recognized by the Supreme Court is when the confession is volunteered. As the Court noted in Miranda, supra, at page 478:

". . . There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by . . . [the threshold warning requirement in custodial interrogation]."

Turning to the evidence in this case it appears that, as a result of a report by two of the victims of the squad's rapacious conduct, the members of the squad were called to the company office for questioning, after they had returned from the field. The procedure of the inquiry is not noted in the record, but it is manifest that the results were unenlightening, and the accused said nothing of an incriminating nature. About noon the inquiry was suspended, and the accused was instructed to "get cleaned up" and return with the squad at 1:00 p.m. He went to his quarters where he shaved and changed clothes. When the squad members reassembled at the company office, they were taken to the chapel to be addressed by a Major Elkins. They arrived about 1:30 p.m.; the Major arrived about 2:00 p.m. Apparently, in the interval, the accused engaged in some soul-searching; at any rate, he spoke to Major Elkins. His testimony as to the circumstances and the content of this conversation is as follows:

"Q. Did you volunteer to make a statement to Major ELKINS prior to going over to CID?

"A. Yes, sir.

"Q. Did you say you'd like to get it off your chest?

"A. I made it down at the chapel, sir, at 1st Battalion, 5th Marines, sir.

"Q. You told Major ELKINS you got to get it off your chest?

"A. Yes, sir.

"Q. And was this with the same desire that you went in to see Top ELLIS?

"A. Yes, sir.

"Q. You did want to get if [sic] off you chest?

"A. Yes, sir."

The accused further testified that after he talked to Major Elkins, Elkins drove him to division headquarters in a jeep. He did not consider himself to be "in custody." On their arrival, Major Elkins took him first to the Division Legal Office. We are not informed as to what transpired at this office, but Major Elkins and Major Bailey, from the legal office, then accompanied the accused to the office of Master Sergeant Charles W. Ellis, Chief Investigator of the Military Police Company. Major Elkins informed Sergeant Ellis that the accused was "willing to talk" about the matters "that had taken place out there." Apparently, this was the first information Ellis had about these matters. The accused admitted that when he went to see Investigator Ellis he "still want[ed] to get this off . . . [his] chest"; he "wanted to hurry and get it off . . . [his] chest so . . . [he] could get something to eat, get some sleep."

In our opinion, the accused's testimony demonstrates that he went to the ■■■■■ ■ Military Police with the desire, and for the express purpose, of making a voluntary statement.[1] It is indeed true, as appellate defense counsel stress in their brief, that the accused testified that when he went to talk to Investigator Ellis he was tired, hungry, and scared. Nothing in all of the accused's testimony about these circumstances, however, casts doubt upon the voluntariness of his statement. As he himself testified, he simply "wanted to hurry and get it off . . . [his] chest," so that he could then go and get something to eat. There is no doubt whatever that the interrogation was not initiated by the Government, but by the accused. The accused was not called to the Military Police office for the purpose of questioning, but he had manifestly determined to go because he affirmatively wanted to confess to his part in the patrol's delicts. Cf. United States v Hardy, 17 USCMA 100, 37 CMR 364. In such a situation, the Supreme Court has said, as we noted earlier, that "[t]here is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime." Miranda, supra, at page 478. We need not be detained, therefore, by the accused's contentions that there were imperfections in the threshold advice. Such advice is calculated to overcome the coercive influence of custodial interrogation, and there was manifestly no such interrogation here. On this record, we are entirely satisfied that the Government fully met its burden of demonstrating that the accused's statement to Sergeant Ellis was given "freely and voluntarily without any compelling influences." Miranda, supra, at page 478.[2]

[1] It may also be fairly inferred from the fact that Major Elkins took the accused first to the Division Legal Office that the accused received legal advice before he went to the Military Police office. The dissenting opinion postulates the existence of some kind of taint in the accused's statements to Major Elkins. The accused's testimony and the excerpt from the tape of his conversation with Agent Ellis, which is quoted in the dissent, demonstrate that the accused's disclosures to Major Elkins were uninfluenced by anything save his own decision to tell the truth. See United States v Jackson, 3 USCMA 646, 650, 14 CMR 64; United States v Ledlow, 11 USCMA 659, 29 CMR 475. While it is true, as the dissent points out, that defense counsel argued that bringing the patrol to the chapel "and warning them of their rights" was "moral" compulsion, the plain fact is that the accused made no claim whatever that he was influenced to speak to Major Elkins because he was in the chapel. There is just no evidence of any reason for the accused's statement to Major Elkins, other than his testimony, quoted in the text, to the effect that he "volunteer[ed] to make a statement to Major ELKINS."

[2] Several days later, the accused made a second statement to Sergeant Ellis. No objection was interposed to the admission of this statement, and the accused admitted it was "part" of the first statement. It is reasonably inferable that the second statement was prompted by the same considerations which led to the first statement and was an integral part of it. See United

In the course of the presentation of its case, the Government introduced testimony indicating the commission of acts of misconduct by both the accused and members of the patrol other than the two offenses charged to the accused. In part, there was testimony to the effect that the husband of the victim of the rape was killed; that the victim's sister-in-law was raped; that another child was killed; that the privacy of various Vietnamese homes was invaded, without apparent justification; and that on his return to the command post, the accused made a false report to a superior commissioned officer as to contact with Viet Cong. Defense counsel objected to some of the evidence, but allowed other testimony about the sequence of events to come in without objection. Whether or not all the evidence of other offenses was properly admitted need not be determined. The record of trial demonstrates that none of it was prejudicial to the accused as to the findings of guilty. The rape charge was dismissed, and the accused's complicity in the murder of the child was compellingly established by other evidence, including his own pretrial statements. We have no hesitancy in concluding that there was no reasonable possibility that the challenged evidence contributed to the outstanding findings of guilty. United States v Johnson, 17 USCMA 479, 38 CMR 277; United States v Kirby, 16 USCMA 517, 37 CMR 137. See also Chapman v California, 386 US 18, 17 L Ed 2d 705, 87 S Ct 824 (1967). Consequently, the findings of guilty of the offense of which the accused stands convicted are unimpeachable.

Left for consideration is the effect of the evidence of other offenses on the sentence. If we assume this evidence was admissible, it was admissible only for a limited purpose. United States v Petty, 3 USCMA 87, 11 CMR 87. This circumstance was recognized by the law officer who instructed the court members specifically on the matter in connection with their deliberations as States v White, 17 USCMA 211, 38 CMR 9.

**164**

to the accused's guilt or innocence. However, in his later instructions on the sentence, the law officer did not remind the court members of the limited purpose for which the evidence was received. In United States v Pendergrass, 17 USCMA 391, 394, 38 CMR 189, we held that it was "the duty of the law officer once more to call the attention of the court to this matter in connection with reaching a proper sentence." It may be doubted whether, at the time of sentencing, the court members recalled the earlier admonition as to the limited purpose of the evidence, or even whether they regarded the instruction as binding upon them in regard to the sentence. United States v Gewin, 14 USCMA 224, 34 CMR 4. The doubt must be resolved in favor of the accused. United States v Kirby, supra, at page 520. We also note that the law officer's instructions on the sentence extended no further than advising them as to the maximum sentence and the voting procedure; in the circumstances of the case, these instructions were inadequate. United States v Wheeler, 17 USCMA 274, 38 CMR 72. While the sentence was reassessed by the board of review, the reassessment did not take into account the instructional errors. Corrective action, therefore, is still required. United States v Kirby, supra.

The decision of the board of review as to the sentence is reversed. The record of trial is returned to the Judge Advocate General of the Navy for submission to the board of review. In its discretion, the board of review may reassess the sentence in light of this opinion, or order a rehearing thereof before a court-martial.

Judge DARDEN coucurs.

FERGUSON, Judge (dissenting):

I dissent.

Accused pleaded not guilty, before a general court-martial convened at Chu Lai, Vietnam, to charges of unpremeditated murder and rape (each specification relating that the acts were committed in conjunction with others), in violation of Uniform Code of Military Justice, Articles 118 and 120, 10 USC

§§ 918 and 920, respectively. He was found guilty as charged and sentenced to a dishonorable discharge, total forfeitures, confinement at hard labor for fifty years, and reduction to the pay grade of E-1. The convening authority disapproved the charge and specification involving rape and reduced the period of confinement to thirty-five years. A Navy board of review approved the guilty finding of unpremeditated murder but affirmed only dishonorable discharge, total forfeitures, reduction, and confinement at hard labor for twenty years as an appropriate sentence. We granted the appellant's petition for review to consider the following two allegations of error:

I. The law officer incorrectly admitted the pretrial statements of the appellant into evidence.

II. The appellant was prejudiced by the introduction into evidence of other offenses not charged.

I

At trial, and over the objection of defense counsel, the transcript of a tape-recorded interview between the accused and a Marine Corps criminal investigator (Prosecution Exhibit 3) was admitted into evidence. In addition, the investigator also testified as to an oral statement made to him by the accused, at a later date, in amplification of the circumstances surrounding the death of the victim of the unpremeditated murder charge. The basis for defense counsel's objection at trial was twofold: (1) Psychological pressure was brought upon the accused and the other suspected men in the patrol when they were taken into a chapel for the purpose of continued interrogation concerning the events of the previous evening and early morning hours which served as a basis for these charges; and (2) accused lacked understanding of the meaning of the warnings given to him under Article 31 of the Code, supra, 10 USC § 831, and as to his right to counsel, because he was tired, hungry, and in need of sleep.

The prosecution countered the defense objection by contending that the accused could have eaten, had he so desired; that he did not tell the Marine investigator he was hungry and tired, but willingly cooperated in the interrogation; and that no coercion was utilized during the interrogation. He did not specifically reply to defense's reference to the fact of the interview in the chapel.

Appellate defense counsel, before this Court, took the position that the law officer erred in admitting the pretrial statement on the ground the Marine investigator's advice to the accused as to his right to counsel was deficient under our opinions in United States v Burns, 17 USCMA 39, 37 CMR 303; United States v McCauley, 17 USCMA 81, 37 CMR 345; United States v Hardy, 17 USCMA 100, 37 CMR 364; United States v Pearson, 17 USCMA 204, 37 CMR 468. The Government, conversely, contended that the advice was sufficient under United States v Mewborn, 17 USCMA 431, 38 CMR 229; if not sufficient, the failure to utilize that ground at trial precludes raising it for the first time on appeal, citing United States v Brown, 10 USCMA 482, 28 CMR 48, and other decisions of this Court on the issue; and, even assuming error, the same should be held harmless under the doctrine espoused by the Supreme Court in Chapman v California, 386 US 18, 17 L Ed 2d 705, 87 S Ct 824 (1967).

It would appear, however, that a more basic issue is present—whether the accused was advised of his rights under Article 31 and United States v Tempia, 16 USCMA 629, 37 CMR 249, prior to the interview in the chapel.

Accused testified relative to the issue of the voluntariness of his pretrial statement. He related that, prior to their return to the company area at about 8:00 a.m. on the day in question, his unit had been in the field all the previous day and on an ambush operation during the night. He had about two hours sleep during the night and had last eaten some combat rations during the previous afternoon. Immediately upon their return, the members of the patrol were directed to report to the company office where each was questioned in turn about the previous

night's operation. The accused was questioned last and when he was released at about noon he was told to shave, clean up, eat, and report back by 12:30 p.m. He did not have time to eat so he shaved and put on clean clothes. Upon return, the patrol members waited about half an hour and were then taken down behind the chapel. "[T]here was a Major there who was going to talk to us." The men were brought into the chapel and separated "so we wouldn't talk to each other." The Major was talking to the Lieutenant at that time. When the Lieutenant left, the Major called each man's name in turn and the men acknowledged their presence. The accused testified that during the course of the afternoon, because he was hungry and tired, he told the Major that he wanted to get it off his chest. He was taken alone by the Major from the chapel at about 4:00 p.m. to the legal office at Chu Lai and from there to the MP shack, arriving at about 8:00 p.m. Questioning by the Marine Corps investigator in the presence of the Major began about an hour later and was concluded in an hour or an hour and one-half. The accused acknowledged that while he felt too tired to talk he did not tell the investigator he was tired and hungry because "I guess I was just scared or something, sir." He did tell the Major in the early afternoon, and the legal officer when they reached Chu Lai, that he had not eaten. Each of them in turn promised he would get to eat but it was not until after his statement was completed that he was taken to the mess hall. He was earlier offered coffee but declined since he does not drink coffee. He answered in the negative when asked whether he knew that c-rations and water were available at the Criminal Investigations Detachment office. No one offered them to him.

The evidence of record reflects that, at the time of the initial interrogation of the accused and his fellow patrol members, they were suspected of having committed murder and rape—the victim of the rape having reached the camp and informed the authorities of these events prior to the return of the patrol. The record is silent as to

whether any warnings were given at the company office but apparently nothing of an incriminating nature was obtained. Similarly, there is no evidence that the Major, who was detailed to investigate the matter, gave a warning at the chapel. The details of the statement which the accused made in the chapel to the Major are not set forth in the record; however, the following excerpt from pages 11 and 12 of the tape-recorded interview of accused by the Marine investigator (Prosecution Exhibit 3) is enlightening:

"A [Sergeant Vogel]. So then, we all were called into the office, and were talking to the XO and told him that story, and then I was the last one in and I told my story, and he said to be back down there at a quarter to, twelve fourty [sic]-five. I went up, got shaved, got cleaned up, the rest of the men were cleaning on their weapons and that, and come back down there. The Captain, Major, Colonel, and a bunch of Lt's, and POTTER, went out to where this happened, and then, they come. Before they come back the XO says come on, and we went down to the chapel and made all the men set their rifles in by the chaple [sic], they got a gun rack there. So now the DOC and myself kept our pistols. Well the Lt. the XO, had two men stand there so we went in the shade along side the chapel so we wouldn't say nothing to nobody, talk to anybody. And then we were called into the chaple [sic], and were sitting there and that's where I met you, sir. The Lt. was in there talking to the Major then, and then he called POTTER'S name. He said LCpl. POTTER, and then POTTER stood up and he started to walk up to the Major. The Major told him to sit down. And then he called Sgt. VOGEL and I stood up and sat back down and he looked around. And then he called me up and I went up and started to tell the story, like we all had it planned. That the men were sitting there and we saw a man running and we all started running after him. I got about where we saw thr [sic] man running and started running

166

after him. I think that's where I stopped and I couldn't take it no more, I had it, and then I told what I told you sir."

At this point the transcript reflects that the accused had already given the investigator a rather detailed account of the patrol's activities on the previous evening, substantiating the story told by the rape victim. It can be presumed that this is also what he told the Major at the chapel.

The requirement for a warning under Article 31, Code, supra, prior to the interview of a suspected offender, by one subject to the Code, is so well established in military law as to require no documentation. Evidence obtained in violation thereof is inadmissible. United States v Taylor, 5 USCMA 178, 17 CMR 178; United States v Corson, 18 USCMA 34, 39 CMR 34; United States v Tharp, 11 USCMA 467, 29 CMR 283; United States v Souder, 11 USCMA 59, 28 CMR 283. Such evidence may not even be used as leads to other evidence. United States v Haynes, 9 USCMA 792, 794, 27 CMR 60. In United States v Bennett, 7 USCMA 97, 101, 21 CMR 223, we announced the following rule on this issue:

". . . [I]f the Government obtains admissions illegally, and they are of a nature likely to produce a subsequent confession, a strong showing that a subsequent warning severed the presumptive influence must be made to permit use of the confession. Furthermore, absent any showing that the accused knew or had been informed that his prior admissions could not be used against him, the fact that he was advised of his rights prior to the execution of his confession would normally not avoid the Taylor result."

The burden is on the Government to establish affirmatively on the record compliance with these requirements. United States v Tharp, supra; United States v Stanley, 17 USCMA 384, 38 CMR 182; United States v Hart, 17 USCMA 524, 38 CMR 322. There is no reference in the transcript of the tape-recorded interview (see below) that the rule announced in United States v Bennett, supra, was adhered to and the Government makes no such claim, despite the fact that the Major was present during, and participated in, the tape-recorded interview and the Marine investigator was at least present at the chapel. Cf. United States v Powell, 13 USCMA 364, 32 CMR 364. Both were aware of the prior interview.

It cannot be contended that there was no requirement for the Major to give a warning prior to his interrogation of the accused in the chapel. The Major was one subject to the Code, and the accused, as noted, was a suspected offender; the accused was directed to appear at the chapel for interview, thus fulfilling the test for custodial interrogation laid down by the Supreme Court in Miranda v Arizona, 384 US 436, 16 L Ed 2d 694, 86 S Ct 1602 (1966), and adopted by this Court in United States v Tempia, supra, i.e., "not whether the accused, technically, has been taken into custody, but, absent that, whether he has been 'otherwise deprived of his freedom of action in any significant way.' Miranda, supra, at page 444." Any thought that this might be considered a threshold or voluntary confession (Miranda v Arizona, supra, at page 478), as contended by my brothers, I likewise reject for, as quoted above, the accused started to tell the Major "the story, like we all had it planned" but "I couldn't take it no more, I had it, and then I told [him] what I told you sir." Defense counsel at trial contended that the statement was involuntary and that the accused broke down at this point because of hunger, lack of sleep and, most of all, the psychological pressure exerted by the Government. As he argued: "He was brought down to a chapel, a chapel which I feel on the part of the government is inexcusable. Bringing men into a chapel and then interrogating them and warning them of their rights and trying to find out what happened when they are accused of crimes. The moral compunction there to tell the truth is something that the government shouldn't be allowed to use."

Defense counsel's statement, quoted above, is the only reference in the rec-

ord that a warning *might* have been given at the chapel; the record does not affirmatively show it. Even assuming that it had been given, the subsequent action of the Government destroyed its effect. Cf. United States v Dalrymple, 14 USCMA 307, 34 CMR 87; United States v Washington, 9 USCMA 131, 25 CMR 393. As the Supreme Court stated in Miranda v Arizona, supra, at page 448:

"Again we stress that the modern practice of in-custody interrogation is psychologically rather than physically oriented. As we have stated before, 'Since Chambers v Florida, 309 US 227, this Court has recognized that coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition.' Blackburn v Alabama, 361 US 199, 206 (1960)."

I do not understand my brothers' failure to deal with this question.

Finally, and with particular regard to the advice ultimately given the accused concerning his right to the assistance of counsel, the following is quoted from the transcript of the interview:

"S: Sgt. VOGEL, I want to advise you of your rights under Art. 31, first let me advise you that my name is MSgt. ELLIS, and I'm a Criminal Investigator for United States Marine Corps, assigned to the 1st Marine Division. I have to advise you under Article 31 that you are a suspect of the alleged offence of Murder, Rape, and Assault with intent to commit murder. As a suspect you don't have to say anything at all; anything you do say, however, can be use [sic] against you in a trial by courts martial or any other military or judicial proceedings.

"Q. Now, do you understand that?

"A. Yes sir.

"Q. What does that mean to you?

"A. That means I do not have to say anything.

"S. Right

"A. I can just keep my mouth shut and not say a word.

"SQ. That's right, but what if you do say something?

"A. It can be used against me.

"S. Alright [sic].

"Q. So you understand your rights under Article 31, no question in your mind?

"A. No sir.

"S. I must also advise you that you have a right to counsel. You may have counsel before this interview, have a counsel here with you, or you can wait till after the interview, but you do have a right to counsel.

"Q. Do you understand that?

"A. Yes sir.

"Q. What does that mean to you?

"A. That means I can have a man here to set with me while I talk and listen in, or I do not have to have one now, I can speak up without him.

"Q. What kind of man are we talking about?

"A. A law one, well he'd be like my attorney.

"S. He'd be your lawyer.

"A. Lawyer and attorney.

"Q. So you know what your rights are to counsel?

"A. Well I don't have to say anything right now, unless I talk to counsel.

"S. That's right.

"A. But I can say it if I want to.

"S. Right.

"Q. Now, do you understand your rights to counsel?

"A. Yes.

"Q. Do you want counsel at this time?

"A. No, I guess not." [Prosecution Exhibit 3, pages 1, 2.]

With the exception of that portion which informed the accused of his right to counsel *after the interview*, a

matter of doubtful value, the advice is no more than that which we held to be inadequate in United States v Groover, 17 USCMA 295, 38 CMR 93, and United States v Gehmlich, 17 USCMA 345, 38 CMR 143. See also United States v Pearson; United States v Tempia, both supra; and United States v Wood, 17 USCMA 257, 38 CMR 55.[1] On this alone the statement should have been rejected. In passing we note the accused's answer: "No, I guess not," when asked if he wanted counsel at that time. Such an equivocal reply tends to substantiate defense counsel's contention that the accused did not understand the value of the right he was thereby foregoing. This is not a clear waiver as contemplated in *Miranda* and *Tempia*, both supra.

With reference to the second statement of the accused, as testified to by Sergeant Ellis, it is reasonable to infer that it was an integral part of the first statement and was similarly tainted. See United States v White, 17 USCMA 211, 218, 38 CMR 9, where we noted that "separate periods of inquiry can constitute a single continuous interrogation."

For the reasons developed above, it is apparent the law officer erred to the substantial prejudice of the accused in admitting the latter's pretrial statements into evidence.

## II

Since I would reverse, only a short comment need be made regarding the second granted issue.

Appellate defense counsel does not argue that the evidence of other misconduct introduced by the Government at trial was inadmissible. They also acknowledge that the law officer, when instructing on findings, correctly limited the purpose for which this evidence could be considered by the court. Defense does contend, however, that the law officer should have given another limiting instruction prior to the court's consideration of the sentence.

In United States v Pendergrass, 17 USCMA 391, 394, 38 CMR 189, we held that it was "the duty of the law officer once more to call the attention of the court to this matter in connection with reaching a proper sentence." It may be doubted whether, at the time of sentencing, the court members recalled the earlier admonition as to the limited purpose of the evidence, or even whether they regarded the instruction as binding upon them in regard to the sentence. United States v Gewin, 14 USCMA 224, 34 CMR 4. The law officer's failure to give a proper instruction was prejudicial error. United States v Pendergrass; United States v Gewin, both supra.

In addition, it is noted that the law officer's instructions on the sentence extended no further than advising them as to the maximum sentence and the voting procedure; in the circumstances of this case, these instructions were inadequate. United States v Wheeler, 17 USCMA 274, 38 CMR 72.

The ordinary remedy, where a case is reversed due to prejudicial error affecting the findings, is to direct that a rehearing may be ordered. However, appellate defense counsel has called attention to the fact that the accused, following his conviction, testified against his co-actor. One of the offenses charged against the latter was the same homicide for which the accused was convicted. Since the accused's testimony was given under a grant of immunity, by the convening authority, "from further prosecution for any offense or offenses arising out of the matters therein involved concerning which you may be required to testify under oath," counsel assert that accused cannot be again tried for the instant offense. United States v Franks, 347 F2d 486 (CA DC Cir) (1965). The Government did not reply to this assertion.

---

[1] For the benefit of Government counsel we point out that United States v Groover, 17 USCMA 295, 38 CMR 93; United States v Gehmlich, 17 USCMA 345, 38 CMR 143; and United States v Wood, 17 USCMA 257, 38 CMR 55, were all decided by this Court more than eight and one-half months after the decision date of Chapman v California, 386 US 18, 17 L Ed 2d 705, 87 S Ct 824 (1967).

Inasmuch as the Government has not been heard on this issue, it is best left for argument at such time as a rehearing, if any, would be held.

I would reverse the decision of the board of review and direct that a rehearing be ordered.