UNITED STATES, Appellee

v

FREDRICK O. SIKORSKI, Private First Class, U. S. Marine Corps, Appellant

21 USCMA 345, 45 CMR 119

No. 24,573

April 28, 1972

*Lieutenant David G. Grimes, Jr.*, JAGC, USNR, argued the cause for Appellant, Accused.

*Captain John P. Proctor*, USMCR, argued the cause for Appellee, United States. With him on the brief was *Commander Michael F. Fasanaro, Jr.*, JAGC, USN.

## Opinion of the Court

QUINN, Judge:

In the first of three assignments of error, the accused alleges that affirmance by the Court of Military Review of certain findings of guilty is irreconcilable with its disapproval of other findings of guilty by a general court-martial convened in the Republic of Vietnam.

As the case came to the United States Navy Court of Military Review, the accused stood convicted of separate charges of conspiracy to commit robbery and murder (Charge I and its specification), unpremeditated murder of an unknown Vietnamese male (Charge II, specification 1), commission of a homicide "while perpetrating a robbery" (Charge II, specification 2), and robbery (Charge III and its specification).[1] The victim in each instance was the same person.

Before the Court of Military Review, the accused advanced a number of assignments of error, including one to the effect that a pretrial statement admitted in evidence against him was not corroborated by independent evidence of guilt. Referring to the pretrial statement as "a confession" which "proved" the Government's case, the

---

[1] In connection with the sentence, the trial judge instructed the court members that the various murder and robbery specifications "merge[d] and are considered really but one offense."

**347**

court determined it was properly admitted in evidence and that the court-martial members "were free to infer, as they did, that the accused killed the deceased while engaged in perpetrating a felonious assault." Later, addressing itself to a defense contention that the evidence was insufficient to "establish [the specific] intent, with respect to robbery, murder, and conspiracy," the court referred to "uncontested testimony" by the accused in which he "stoutly denied" any "preconceived" intent to kill or rob, and maintained that he had joined others in an attack upon the victim only in order "to beat [him] up." The court discerned no "sound basis" in the evidence to justify disregard of this testimony. It, therefore, set aside the court-martial's findings of guilty of conspiracy and robbery and dismissed those charges; but it affirmed the findings of guilty of unpremeditated murder (specification 1, Charge II) and the findings of guilty of killing the same person "while perpetrating a robbery" (specification 2, Charge II).

The accused contends that affirmance of findings of guilty of robbery-homicide "is inconsistent with . . . [the court's] holding that the evidence does not establish the requisite intent with respect to the robbery."

Assessing what it perceives as the "substance" of the Court of Military Review's action, appellate Government counsel contend that the court was concerned only with the disposition of multiplicious charges, not with the elements of the respective offenses, so that dismissal of the robbery specification and the charge of conspiracy to commit robbery and murder had no legal effect on the felony murder charge. See United States v Drexler, 9 USCMA 405, 26 CMR 185 (1958). The contention disregards both the issues presented by the accused's assignments of error and the language of the court's decision. In the latter, the court specifically refers to proof beyond a reasonable doubt and to "evidence . . . insufficient in weight to support" the offenses of conspiracy and robbery. Unmistakably, the court

**348**

was not considering the multiplicious nature of the offenses but the sufficiency of the evidence to support the findings of guilt. We turn then directly to the accused's contention that affirmance of findings of guilty of homicide while in the commission of a robbery is inconsistent with the Court of Military Review's disapproval of the findings of guilty of robbery. See United States v Clark, 20 USCMA 140, 42 CMR 332 (1970).

A Court of Military Review has independent fact-finding power. In the exercise of that power, the court can "weigh the evidence . . . and determine controverted questions of fact" differently from the court-martial. Article 66(c), Uniform Code of Military Justice, 10 USC § 866; United States v Baldwin, 17 USCMA 72, 37 CMR 336 (1967); United States v Remele, 13 USCMA 617, 33 CMR 149 (1963). Here, the court did not entirely exonerate the accused of responsibility for the victim's death. On the contrary, it expressly held that the totality of evidence justified a finding that he "killed the deceased while engaged in perpetrating a felonious assault." See Article 118, Code, supra; United States v McDonald, 4 USCMA 130, 134, 15 CMR 130 (1954). The accused does not challenge the validity of this part of the court's decision. What he does challenge is the court's affirmance of the findings of guilty of specification 2, Charge II, which alleges that he brought about the victim's death "while perpetrating a robbery," notwithstanding it had determined he lacked the requisite state of mind for robbery and, for that reason, dismissed the robbery charge.

The opinion of the Court of Military Review manifests that the court weighed and found wanting the Government's evidence as to the accused's intent to kill or to rob the victim. The opinion also makes clear that the court found no "sound basis" for disregard of the accused's testimony that he believed and "understood that he

and his companions were only going to 'beat up' the" victim. Plainly, the court was, as fact finder, unconvinced that the accused intended "to rob" and "murder" the victim. It is impossible to reconcile this specific factual determination in regard to the conspiracy and robbery charges with the court's finding that the accused caused the victim's death "while perpetrating a robbery," as alleged in the robbery-homicide specification.

All the offenses were connected. The object of the conspiracy was allegedly robbery; the robbery alleged in the robbery-homicide specification was the same robbery alleged in the separate robbery charge.[2] In Ledbetter v State, 224 Md 271, 167 Atl 2d 596 (1961), the jury's acquittal of the defendant of robbery, but conviction of felony murder, was held not to be "completely illogical." The Maryland court noted that the jury could have concluded that the defendant did not commit a completed act of robbery, which justified acquittal of that charge, but that he did commit homicide in attempted robbery, which justified conviction on the felony murder count. The specificity of the Court of Military Review's finding of insufficient evidence to establish the requisite state of mind distinguishes this case from Ledbetter. If the evidence was insufficient to prove the intent required for the robbery charge, the accused could not have engaged in "perpetrating a robbery" when he assaulted the victim. Thus, the court's finding in regard to the robbery specification was "mutually exclusive" of the finding that he committed homicide "while perpetrating a robbery." United States v Clark, supra; see also United States v Hooten, 12 USCMA 339, 342, 30 CMR 339 (1961). The Court of Military Review should also have disapproved the findings of guilty as to specification 2, Charge II.

Turning to the trial, the accused contends that certain instructions by the judge were erroneous. The instructions deal with the relationship between the voluntariness of a pretrial statement, admitted in evidence over defense objection, and the accused's testimony. They are as follows:

"Now, with regard to in-court testimony of the accused; if the members find that the pretrial statement of the accused was either involuntary or uncorroborated, and you have therefore excluded if [sic] from your consideration, you must then determine whether the testimony of the accused in court was caused by the admission of the pretrial statement into evidence. Therefore, unless you are satisfied beyond reasonable doubt that the testimony of the accused was not caused by the admission of the pretrial statement admitted into evidence, which you have determined to be involuntary or uncorroborated, you must also exclude his in-court testimony from your considerations and your deliberations on the question of his guilt or innocence."

United States v Carey, 21 USCMA 33, 34, 44 CMR 87 (1971), determined that instructions of the kind in issue are erroneous because they deprive "the accused of an opportunity to defend himself at trial." The Government contends, however, that the instructions were appropriate to the evidence in this case and, for that reason, were specifically requested by defense counsel. Among other things, the Government perceives such "detail for detail" agreement between the pretrial statement and the accused's trial testimony as to make it manifestly advantageous for the accused to put the two in tandem, so that rejection of the pretrial statement would carry with it rejection of adverse trial testimony. Whatever the abstract merit

---

[2] Since the Court of Military Review dismissed the conspiracy charge, we need not consider whether it could have affirmed findings of guilty of conspiracy to commit an assault with a deadly weapon or an assault with an intent to inflict grievous bodily harm. United States v King, 10 USCMA 465, 28 CMR 31 (1959).

of the argument, it is not factually supported by a comparison of the pretrial statement with the accused's testimony. Suffice it to note, that nowhere in the pretrial statement did the accused deny the intent to rob the victim. On the contrary, his account of the assault on the victim readily supports an inference of an intent to rob. However, at trial, the accused testified he intended only "to more or less hold the guy" and "work him over"; the victim had "nothing that . . . [he] wanted" and he "didn't want to kill the guy."

The record of trial indicates the erroneous instructions were thought to be required by United States v Bearchild, 17 USCMA 598, 38 CMR 396 (1968), which, in turn, relied upon Harrison v United States, 392 US 219, 20 L Ed 2d 1047, 88 S Ct 2008 (1968). In *Harrison,* the accused was convicted, but the conviction was overturned on appeal on the ground an illegally obtained pretrial statement had been improperly admitted in evidence. At a rehearing of the case, over defense objection, the Government introduced the accused's testimony at the first trial. Reviewing the correctness of the trial judge's ruling as to admissibility of the accused's former testimony, the Supreme Court noted that all wrongfully obtained evidence, including the " 'fruit of the poisonous tree,' " cannot " 'be used at all' "; the Court observed that if the accused's trial testimony had been impelled "to overcome the impact of confessions illegally obtained," it, too, was inadmissible. *Bearchild* dealt with this relationship between an improperly obtained pretrial statement and trial testimony. The Court determined that a pretrial confession should not have been admitted in evidence; it then proceeded to consider whether the accused's trial testimony was the product of the impermissible use of his confession. Citing *Harrison,* the Court concluded that the Government failed to show affirmatively that the erroneous admission of the confession had not impelled the accused to testify. As a result, the Court held it could not look to the accused's testimony to determine whether his judicial admissions, if any, would "cure the error" in the admission of the illegally obtained confession. Cf. United States v Trojanowski, 5 USCMA 305, 17 USCMA 305 (1954). However, *Bearchild's* limitation on the use of the accused's trial testimony did not sanction any instruction that would "deprive . . . [him] of a defense." United States v Hurt, 19 USCMA 206, 210, 41 CMR 206 (1970).

Our opinion in United States v Carey, supra, made apparent the impossibility of submitting to the court members for their determination the question of the corruptive effect on the accused's trial testimony of the erroneous admission of an illegally obtained statement. Referring to the "anomalous situation" created by such submission, we pointed out that the court-martial could not adhere to *Harrison's* admonition that tainted evidence could not be "used at all" and, at the same time, accord the accused the due process right *"to testify in his own defense and to have that testimony considered by the court"* in its deliberations on his guilt or innocence. *Ibid.,* at page 35. We further explored the problem in United States v Mackey, 21 USCMA 254, 45 CMR 28 (1972).

Contrary to the situation in *Carey,* in United States v Mackey, supra, the trial judge did not instruct the court members that they should disregard the accused's trial testimony if not convinced beyond a reasonable doubt that his pretrial statement was voluntary and that the Government had affirmatively demonstrated the trial testimony was not impelled by the admission in evidence of the pretrial statement. In this Court, the accused contended that the judge's failure to give the instruction was prejudicial error. We pointed out that the question of whether there is error in the admission of a pretrial statement is a question of law and, further, whether this error had any effect on the accused's trial testimony is also a question of law. We, therefore, concluded that

instructions of the kind in issue should not be given at trial.

Besides determining the proper procedure for the trial court, *Mackey* also resolved the question of when inquiry is required into the connection between the accused's pretrial statement and his trial testimony. It held that no examination of this relationship need be made until it is first determined that, as a matter of law, the pretrial statement should not have been admitted in evidence. We agree with the accused, therefore, that under *Carey* and *Mackey*, it was error to give the quoted instructions.

An instructional error is not automatic ground for reversal of an otherwise valid conviction. If there was actually no issue of fact to submit to the court members for their determination, "the error may be disregarded." United States v Spivey, 8 USCMA 712, 715, 25 CMR 216 (1958); United States v Shaw, 13 USCMA 144, 32 CMR 144 (1962). Similarly, determination of the effect of an erroneous instruction may be precluded by the fact that the instruction was specifically requested by the accused. United States v Jones, 7 USCMA 623, 629, 23 CMR 87 (1957).[3] Both circumstances are present here.

The instructions now challenged by the accused were specifically requested by him at trial, with the judge granting the request over the Government's objection. Also, no issue of voluntariness was present for the court members' consideration so there is no fair risk that they could have rejected the accused's trial testimony as the product of a statement not proven to be voluntary. Our conclusion that no issue of voluntariness was present for submission to the court members is founded upon the difference between the accused's testimony before the trial judge at an Article 39 (a) session and his testimony in open court before the court members. If testimony before the judge raised the issue, the testimony before the court members definitely did not. A discussion by the judge and both counsel on proposed instructions indicates they recognized that differences existed, but they were uncertain as to their extent and so proceeded without regard to them. The differences are apparent as to both prongs of the accused's attack on the voluntariness of the pretrial statement.

At the Article 39(a) session, the accused testified that when he awakened on the morning of the interview, he had a "hangover" and "right when . . . [he] got up," he "drank two beers." Before the court members, he said nothing about drinking the previous night and nothing about having a "hangover." Moreover, he substantially limited the alleged effect of two beers he drank during the interview with Agent Slagle. In court, he admitted that after he had advised Agent Slagle that he understood his rights and was willing to make a statement, he requested a beer. He was given a can of beer which he consumed while being questioned; later he asked for, received, and drank another beer. He testified that the consumption of the two cans of beer "relaxed . . . [him] a lot" and made him "lightheaded." Pressed by defense counsel as to whether that was "all," he replied: "Yes. I'd say that's all." He did not claim to be intoxicated in any degree, and he did not maintain, as he

[3] Other circumstances may also make it inappropriate for the appellate court to consider the erroneous instruction. For example, the record of trial may demonstrate the absence of any fair risk of prejudice to the accused as a result of the error. United States v Forwerck, 12 USCMA 540, 31 CMR 126 (1961); United States v Mantooth, 6 USCMA 251, 19 CMR 377 (1955); see also United States v Evans, 454 F2d 813 (CA 8th Cir) (1972); as to the effect on trial testimony of matter obtained in an illegal search and seizure; compare United States v Mackey, 21 USCMA 254, 45 CMR 28 (1972), footnote 2.

did at the out-of-court hearing, that his ability "to think out" his choice between speech and silence was impaired by his drinking. By the time he had consumed the second beer, he had been discussing with Agent Slagle his involvement in the case for at least an hour. At the end of the oral questioning, he personally wrote out his account of the incident that had resulted in the victim's death. He admitted that from the beginning of the interrogation he knew he had the right to remain silent and the right to counsel. Thus, even if he was "relaxed" and "lightheaded" as a result of drinking two beers, the circumstances do not suggest in the slightest that his ability to understand and to exercise his right to remain silent was impaired. This aspect of the accused's attack on the voluntariness of the statement presented no question for the court members' consideration. See United States v Backley, 2 USCMA 496, 498, 9 CMR 126 (1953); United States v Jackson, 5 USCMA 584, 588, 18 CMR 208 (1955); cf. United States v Morphis, 7 USCMA 748, 23 CMR 212 (1957).

The second aspect of challenge to the voluntariness of the pretrial statement dealt with the preliminary advice the accused received as to his rights during questioning. At the Article 39(a) session, he testified that Agent Slagle did not inform him he had the right to remain silent and did not advise him that anything he said could be used against him in a court-martial. He insisted Agent Slagle had only "asked . . . [him] if . . . [he] knew . . . [his] rights," and that, in fact, he did not fully understand his rights. In open court, however, the accused testified that before he was questioned, Agent Slagle advised him he was suspected of murder. Then, at his request, Slagle allowed him to read statements made by others. When these were read, said the accused, *"he told me about my rights, and showed me that sheet of paper."* (Emphasis supplied.) The paper recited all the rights of an accused at an interrogation.[4] Although at one point in his trial testimony, the accused maintained that he did not actually read the paper, he also testified that he "couldn't really say for sure if . . . [he] *had finished reading them* [the listing of his rights] or not," before he informed Slagle that he "knew his rights." (Emphasis supplied.) In our opinion, this testimony alone demonstrates the absence of evidence to raise an issue as to the adequacy of the advice given the accused in regard to his rights at the interview and his understanding of them. However, even if we read the accused's testimony too narrowly, it is clear beyond all doubt that he freely and voluntarily elected to speak rather than remain silent.

The requirement of advice as to the right to remain silent and to have counsel at the threshold of custodial interrogation was perceived by the Supreme Court of the United States as an "indispensable" requirement in order "to insure that the individual knows he is free to exercise the privilege at that point in time." Miranda v Arizona, 384 US 436, 469, 16 L Ed 2d 694, 86 S Ct 1602 (1966). Here, the accused admitted he knew before he spoke to Agent Slagle that he had the right to remain silent and the right to have counsel. His previous knowledge did not, of course, obviate the requirement that he be advised of his rights before questioning. "[W]e will not pause to inquire in individual cases," said the Supreme Court in *Miranda,* "whether the defendant was aware of his rights without a warning being given." *Ibid.,* at page 468. If the accused's testimony is believed, it indicates that he so frustrated Agent Slagle in his efforts to inform him of his rights that it can only be concluded that his decision to speak was not the result of an overbearing of his will but "an independent decision on his part," made with full knowledge of the right to choose freely between silence and speech and between having

[4] The recital of rights in the statement and the accused's signature thereon are set out in the Appendix.

counsel and proceeding without counsel. *Ibid.*, at page 465.

As we indicated earlier, according to the accused, Agent Slagle informed him he was suspected of murder. "Then," the accused said "he told me, . . . he told me about my rights." Giving the accused's testimony its most restrictive meaning, it still appears that as Slagle was explaining what these rights were, the accused interrupted. He told Slagle he had "worked around law enforcement agencies" and he "started telling him [Slagle] my rights."[5] He was not asked, and he did not say, what rights he enumerated, but he admitted he knew he could remain silent and that he "could see a lawyer before being questioned" and that his lawyer could be a civilian, whose fee he would have to pay, or a military lawyer, who would be provided at "no expense at all" to him. Whereupon, Slagle handed him a paper. The accused admitted that he told Slagle that he "had seen a sheet similar to" it. The admission fairly implies that the accused read the contents of the statement; the inference is strengthened to practical certainty by other testimony by the accused to the effect that he was not sure "he had finished reading" the statement, when he told Slagle he "knew his rights." At any rate, the accused acknowledged that he signed the statement enumerating his rights, as indicated in the Appendix to this opinion.

This is not a "silent record," with "speculation" as a basis for assessment of the accused's decision to speak. Cf. Miranda v Arizona, supra, pages 468–469, 499; United States v Stanley, 17 USCMA 384, 38 CMR 182 (1968). The accused twice prevented Agent Slagle from fully informing him of his rights, once when he interrupted Slagle's oral recital and again when he may not have "finished" reading the written recital; still he freely and without any external influence, signed the statement to indicate he read all

of it. The accused also left no room to speculate about the extent of his knowledge of his rights because he specifically told Agent Slagle he had worked around law enforcement agencies and he "knew . . . his rights."

The record, therefore, demonstrates beyond all doubt that accused's decision to speak was as informed and as freely made as that of "a person who enters a police station and states that he wishes to confess to a crime." *Miranda,* at page 478. See also United States v Vogel, 18 USCMA 160, 39 CMR 160 (1969). The accused's own testimony establishes the voluntariness of the statement, and raised no issue for the court members' consideration.

After the trial, five of the eight members of the court-martial made different recommendations for reduction of the period of confinement from life to a term of years. The recommendations, along with other matters, were mentioned by the staff judge advocate in his post-trial advice to the convening authority. The staff judge advocate indicated that on the basis of the specified matters, he recommended reduction in the period of confinement from life to thirty years. The accused contends that the advice was prejudicially deficient because the staff judge advocate did not mention the period of confinement recommended by each court member. In our opinion, the staff judge advocate's comments were sufficient to alert the convening authority to the existence of the clemency recommendations and to the need to take them into account in deciding on an appropriate sentence. See United States v Gibson, 21 USCMA 276, 45 CMR 50, decided March 24, 1972.

The decision of the United States Navy Court of Military Review as to specification 2, Charge II, and the sentence is reversed. The findings of guilty of specification 2, Charge II, are set aside, and the charge is ordered dismissed. The record of trial is re-

[5] Asked if Agent Slagle had "spelled . . . out" the rights "for him," the accused replied: "If he did . . . I don't remember it."

turned to the Judge Advocate General of the Navy for submission to the Court of Military Review for reassessment of the sentence on the basis of the remaining findings of guilty.

Chief Judge DARDEN and Judge DUNCAN concur.

## APPENDIX

STATEMENT of FREDRICK O. SIKORSKI, Pfc, USMC (Suspect)

3 Jan. 70
(Date)

I, F. O. SIKORSKI, have been informed by SSGT E. S. SLAGLE, JR. that he is (they are) acting in the official capacity of CRIMINAL INVESTIGATOR.

I have been advised that I am suspected of the offense of MURDER and I am aware that other offenses may possibly come to light during the interrogation.

1. I have been advised that I have the right to remain silent.

2. I have been advised that if I do make any statement it can be used against me in a trial by court-martial or other disciplinary or administrative proceeding.

3. I have been advised that I have the right to consult with lawyer counsel at any time prior to or during the interrogation. I further understand that such counsel may be military lawyer counsel of my choice if reasonably available; civilian counsel provided at my own expense; or military lawyer counsel appointed for me. I further understand that military lawyer counsel of my choice, if reasonably available or military lawyer counsel appointed for me will be provided free of charge. I further understand that I have the right to have such aforementioned lawyer counsel present with me at any time during the interrogation, if I so desire. Finally, I understand that if I do desire counsel at any time prior to or during the interrogation, I cannot be interrogated unless and until such counsel is made available to me and I have actually consulted with him.

4. I understand that at any time I wish the questioning to be discontinued I have only to indicate in any manner that I do not wish to be interrogated.

5. I desire to consult with ———.
(Specific named lawyer counsel)

6. I request that military lawyer counsel be appointed for me and I desire to consult with him ———. (Signature of suspect)

7. Understanding the rights set forth in paragraphs 1, 2, 3 and 4 above, I do not desire to consult with lawyer counsel /s/ Fredrick O. Sikorski. (Signature of suspect)

Witnessed:

/s/ Everett S. Slagle, Jr.
(Signature of witness)

/s/ Charles S. Catlin
(Signature of witness)